STATE of Minnesota, Appellant/Cross–Respondent,

v.

Christopher Thomas WENTHE, Respondent/Cross–Appellant.

No. A12–0263.

Supreme Court of Minnesota.

Nov. 6, 2013.

84

Lori Swanson, Attorney General, Saint Paul, Minnesota; and John J. Choi, Ramsey County Attorney, Peter R. Marker,

Assistant County Attorney, Saint Paul, Minnesota, for appellant/cross-respondent.

Paul Engh, Minneapolis, Minnesota, for respondent/cross-appellant.

## OPINION

GILDEA, Chief Justice.

In this case, we address whether Minn. Stat. § 609.344, subd. 1(*l*)(i) (2012) (clergy-sexual-conduct statute), violates the Establishment Clause of the United States Constitution. A Ramsey County jury found respondent/cross-appellant Christopher Wenthe guilty of third-degree criminal sexual conduct, in violation of Minn.Stat. § 609.344, subd. 1(*l*)(i), based on a sexual relationship between Wenthe, a Roman Catholic priest, and a parishioner. The court of appeals reversed Wenthe's conviction, holding that although Minn.Stat. § 609.344, subd. 1(*l*)(i), was not facially unconstitutional, it violated the Establishment Clause as applied to Wenthe. Because we conclude that the clergy-sexual-conduct statute does not facially violate the Establishment Clause and that Wenthe did not prove that the clergy-sexual-conduct statute as applied violates the Establishment Clause, we affirm in part, reverse in part, and remand to the court of appeals.

Wenthe was a Roman Catholic priest at a Saint Paul, Minnesota, parish. In the summer of 2003, Wenthe met A.F., a parishioner, at a picnic. A.F. gave Wenthe a ride back to the parish where they discussed some of A.F.'s personal struggles. A.F., who was sexually abused as a child and suffered from bulimia, sought guidance from a "spiritual director" at the parish in the fall of 2003. The spiritual director advised A.F. to obtain both a trained lay therapist and a "regular confessor" to help her deal with her eating disorder. A.F. approached Wenthe to be her "regular confessor." Wenthe agreed and, in October 2003, he heard A.F.'s confession. According to A.F., Wenthe heard her confession anonymously three or four more times after the October 2003 confession. It is undisputed that over time Wenthe and A.F. formed a friendship, spent time together in social contexts, shared their personal concerns and struggles, and talked for hours about theological matters.

One evening in November 2003, A.F. invited Wenthe to her apartment to celebrate his birthday. They talked from 10:30 p.m. until 6:00 a.m. The conversation centered on topics of religion and sexuality, including the *Theology of the Body,* a commentary by Pope John Paul II. They also discussed A.F.'s abuse as a child.

The next evening, Wenthe and A.F. met in Wenthe's private quarters in the church rectory. The parties disputed the purpose for this meeting. A.F. testified that she met with a lay therapist for the first time that day, an experience she found overwhelming. A.F. said that she wanted aid and comfort after her lay therapy session and so she decided to accept the offer she said that Wenthe made the previous night to "call him after" her session. Wenthe disagreed that A.F. met him at his invitation. He testified instead that he and A.F. simply agreed to get together in his private quarters later that day. While they disagreed over the purpose of the meeting, both Wenthe and A.F. testified that they engaged in sexual conduct that evening.

Thereafter, A.F. and Wenthe engaged in sexual conduct about once every 2 weeks for approximately a year. A.F. testified that during that time she still considered Wenthe to be her priest and asserted that their faith was the basis of the relationship. Wenthe testified that their relationship changed "very quickly" and that he was not her priest during the period of the

sexual relationship. The last sexual encounter occurred in early February 2005.

In late summer 2005, a friend of A.F. reported the sexual relationship between Wenthe and A.F. to the archdiocese. This report prompted A.F. to meet with an advocate from the clergy-abuse program and a priest who works within the diocese to prevent clergy misconduct. Later, A.F. met with the archbishop and a bishop and sent a letter to the archbishop detailing her relationship with Wenthe. A.F. testified that her motivation for dealing with this matter through the church was to make sure "that this couldn't happen to anyone else." A.F. testified that the church assured her that there were "things in place that would ensure that ... Wenthe was getting help." The priest who met with A.F. interviewed Wenthe regarding the relationship, and this priest testified that Wenthe told him that he had an illicit relationship with A.F., and that he had provided some pastoral care to her.

A.F. testified that she was comfortable with how the church handled the situation, in part because Wenthe was only an assistant priest. But A.F. became concerned in 2009, when she discovered that Wenthe had been assigned to be the parish priest in Delano. A.F. sent letters to the new archbishop and, after the church told A.F. that Wenthe had been rehabilitated, she went to the police.

The State charged Wenthe with one count of third-degree criminal sexual conduct, in violation of Minn.Stat. § 609.344, subd. 1(*l*)(ii) (2012), which prohibits sexual conduct between a clergy member and a parishioner that occurs while the parishioner is meeting with the clergy member on an ongoing basis for spiritual counsel. The State subsequently amended the complaint to include a second count of third-degree criminal sexual conduct, in violation of Minn.Stat. § 609.344, subd. 1(*l*)(i),

which prohibits sexual conduct between a clergy member and a parishioner that occurs during the course of a single meeting in which the parishioner sought or received spiritual counsel.

Wenthe filed a motion to dismiss the complaint, arguing that Minn.Stat. § 609.344, subd. 1(*l*) (2012), was unconstitutional, both facially and as applied in this case, because it violated the Establishment Clause. The district court denied the motion. Wenthe then filed a motion in limine, seeking to prevent the State from using evidence of Catholic Church doctrine and procedures. At a pretrial hearing, the State assured the district court that it would not present evidence regarding Catholic Church doctrine or internal church procedures regarding how the church responds to allegations of abuse. At trial, however, the State presented some evidence that related to Catholic Church doctrine.

The jury acquitted Wenthe of the count alleging sexual contact while A.F. was meeting with Wenthe on an ongoing basis for spiritual counsel. See Minn.Stat. § 609.344, subd. 1(*l*)(ii). But the jury found Wenthe guilty of the count alleging sexual conduct "during the course of a meeting" in which religious advice or assistance was sought or received in private. See Minn.Stat. § 609.344, subd. 1(*l*)(i). The district court convicted Wenthe and sentenced him to 57 months in prison, stayed execution of the sentence, and placed Wenthe on probation for 15 years.

Wenthe appealed, arguing that Minn. Stat. § 609.344, subd. 1(*l*)(i), violated the Establishment Clause on its face and as applied to him. The court of appeals held that the clergy-sexual-conduct statute is not facially unconstitutional. *State v. Wenthe,* 822 N.W.2d 822, 826 (Minn.App. 2012). But the court of appeals found that the statute was unconstitutionally applied

to Wenthe because religion was excessively entangled in his trial, and the court reversed Wenthe's conviction. *Id.* at 826–30. We granted the State's petition for review on the issue of whether the clergy-sexual-conduct statute violated the Establishment Clause as applied to Wenthe and Wenthe's cross-petition for review on the issue of whether the clergy-sexual-conduct statute facially violates the Establishment Clause.

 Whether a statute is unconstitutional is a question of law we review de novo. *State v. Wicklund,* 589 N.W.2d 793, 797 (Minn.1999). Minnesota statutes are presumed constitutional and we exercise our authority to declare a statute unconstitutional with "extreme caution and only when absolutely necessary." *In re Haggerty,* 448 N.W.2d 363, 364 (Minn.1989). Because Wenthe challenges the constitutionality of the clergy-sexual-conduct statute, he bears the burden of demonstrating that a constitutional violation has occurred. *State v. Tenerelli,* 598 N.W.2d 668, 672 (Minn.1999).

## I.

 The Establishment Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. The Establishment Clause applies to the states through the Due Process Clause of the Fourteenth Amendment. *Lee v. Weisman,* 505 U.S. 577, 620 n. 4, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992). The Establishment Clause forbids state action that: (1) lacks a secular purpose; (2) has the primary effect of advancing or inhibiting religion; or (3) fosters excessive entanglements with religion (*Lemon* test). *Lemon*

*v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).[1] State action violates the Establishment Clause if any of the three prongs of the *Lemon* test is violated. *Edwards v. Aguillard,* 482 U.S. 578, 583, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987).

Wenthe argues that the clergy-sexual-contact statute violates the Establishment Clause both facially and as applied. We addressed the constitutionality of the clergy-sexual-conduct statute in *State v. Bussmann,* 741 N.W.2d 79 (Minn.2007). In *Bussmann,* we were evenly divided on the issue of whether the clergy-sexual-conduct statute facially violated the Establishment Clause. *Id.* at 92 (Hanson, J., plurality opinion). A majority of the court, however, concluded that the statute as applied violated the Establishment Clause, and we reversed Bussmann's conviction on that ground. *Id.* at 93–95 (Hanson, J., majority opinion). *Bussmann* involved Minn.Stat. § 609.344, subd. 1(*l*)(ii), *see* 741 N.W.2d at 81, while Wenthe was convicted of violating Minn.Stat. § 609.344, subd. 1(*l*)(i). Both statutory provisions prohibit a clergy member from having sexual contact with a parishioner when the parishioner is seeking or receiving "religious or spiritual advice, aid, or comfort" in private. *Compare* Minn.Stat. § 609.344, subd. 1(*l*)(i) (prohibiting such conduct "during the course of a meeting in which the complainant sought or received religious or spiritual advice, aid, or comfort from the actor in private"), *with id.,* subd. 1(*l*)(ii) (prohibiting such conduct "during a period of time in which the complainant was meeting on an ongoing basis with the actor to seek or receive religious or spiritual advice, aid, or comfort in private"). Because of the substantial

1. Wenthe asserts that we should dispense with the *Lemon* test. But Wenthe did not make this argument to the district court. To the contrary, Wenthe affirmatively relied on the *Lemon* test to argue that the statute was unconstitutional. This issue therefore is waived. *State v. Campbell,* 814 N.W.2d 1, 4 n. 4 (Minn.2012).

similarities between these provisions, our analysis in *Bussmann* applies with equal force to this case.

## A.

■ We turn first to the question of whether the clergy-sexual-conduct statute facially violates the Establishment Clause. Minnesota Statutes § 609.344, subd. 1(*l*)(i), provides:

> A person who engages in sexual penetration with another person is guilty of criminal sexual conduct in the third degree if . . . the actor is or purports to be a member of the clergy, the complainant is not married to the actor, and:
>
> (i) the sexual penetration occurred during the course of a meeting in which the complainant sought or received religious or spiritual advice, aid, or comfort from the actor in private[.]

Wenthe argues that section 609.344, subdivision 1(*l*)(i), fails all three prongs of the *Lemon* test.

*Secular Purpose*

The first prong of the *Lemon* test requires that state action have a secular purpose. *Lemon*, 403 U.S. at 612–13, 91 S.Ct. 2105. Wenthe argues that the clergy-sexual-conduct statute does not have a secular purpose because it regulates "only the conduct of clergy" and treats "clergy members separately from other counselors." In *Bussmann*, however, we unanimously agreed that section 609.344, subdivision 1(*l*)(ii), has a secular purpose. 741 N.W.2d at 86–87 (Hanson, J., plurality opinion); *id.* at 95–96 (Anderson, Paul H., J., concurring); *id.* at 96–98 (Anderson, Russell, C.J., dissenting). Consistent with *Bussmann*, we conclude that section

609.344, subdivision 1(*l*)(i), has a secular purpose.

*Primary Effect*

■ The second prong of the *Lemon* test examines whether a statute has the primary effect of advancing or inhibiting religion. *Lemon*, 403 U.S. at 612–13, 91 S.Ct. 2105. Wenthe contends that the clergy-sexual-conduct statute inhibits religion. We agree that the clergy-sexual-conduct statute has an incidental effect on clergy members because it covers behavior committed by clergy within the scope of the clergy-parishioner relationship. But a law is not unconstitutional merely because it "incidentally" or indirectly inhibits religion.[2] *Cf. Widmar v. Vincent*, 454 U.S. 263, 273, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (noting that the Court had "explained that a religious organization's enjoyment of merely 'incidental' benefits does not violate the prohibition against the 'primary advancement' of religion").

The question instead is whether the statute has the primary effect of inhibiting religion. *Lemon*, 403 U.S. at 612, 91 S.Ct. 2105. The clergy-sexual-conduct statute's primary effect is to protect individuals that the Legislature deems vulnerable, and it covers only those clergy who choose to use their position as a clergy member, or who hold themselves out as a clergy member, to enter into sexual relationships with vulnerable individuals. *See Carter v. Peters*, 26 F.3d 697, 699 (7th Cir.1994) (finding the primary effect of a sentence enhancement for individuals who committed crimes at a place of worship was "not on those deciding whether to attend religious services, but on persons . . . who commit crimes in or around places of worship during or near times of worship services"). The statute does not impose burdens on becoming or

---

**2.** In *Bussmann*, the appellant conceded that section 609.344, subdivision 1(*l*)(ii), did not advance or inhibit religion, so we did not analyze the issue. 741 N.W.2d at 86 (Hanson, J., plurality opinion).

remaining a clergy member of any religion, and it does not prevent individuals from seeking religious or spiritual aid, advice, or comfort or otherwise interfere with efforts to seek such assistance. And, because the statute covers relationships in which a parishioner is seeking any type of "religious or spiritual advice, aid, or comfort," regardless of the substance of that "advice, aid, or comfort," the statute does not interfere with the practice of any particular religious doctrine or only certain religions. *See* Minn.Stat. § 609.344, subd. 1(*l*)(i).

Wenthe nevertheless argues that the clergy-sexual-conduct statute violates the Establishment Clause because it directly targets clergy. We disagree. Both our court and the Supreme Court have held that a statute does not necessarily have the primary effect of advancing religion even though the statute singles out religious institutions. In *Bowen v. Kendrick*, the Supreme Court upheld a statute that funded a program to prevent teenage pregnancy, even though part of the program specifically identified religious organizations as institutions receiving funding. 487 U.S. 589, 608–09, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988). The Supreme Court held that the statute did not have the primary effect of advancing religion, in part, because similar standards applied to other organizations, which reflected the statute's maintenance of neutrality between religion and nonreligion. *Id.; see also Walz v. Tax Comm'n. of the City of N.Y.*, 397 U.S. 664, 675, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970) (upholding a tax statute that specifically exempted religious organizations). Similarly, we have enforced a statute that specifically identified religious organizations for the purpose of tax exemptions. *Ideal Life Church of Lake Elmo v. Cnty. of Wash.*, 304 N.W.2d 308, 315–17 (Minn.1981). While these statutes specifically identified religious organiza-

tions, the statutes did not have the primary effect of advancing religion because the religious organizations were part of a broader statutory scheme in which the State established a set of groups it considered "beneficial and stabilizing influences in community life." *Walz*, 397 U.S. at 673, 90 S.Ct. 1409.

Like the statutes at issue in these cases, the clergy-sexual-conduct statute specifically addresses religion through its prohibition of certain conduct committed by members of the clergy. But the inclusion of religious actors does not violate the Establishment Clause because the limitation on members of the clergy is part of a larger statutory scheme that regulates the behavior of those involved in certain sexual relationships—relationships for which the Legislature has determined there is a power imbalance between the parties. *Bussmann*, 741 N.W.2d at 95–96 (Anderson, Paul H., J., concurring); *Id.* at 98 (Anderson, Russell, C.J., dissenting); *see also* Thomas P. Doyle & Stephen C. Rubino, *Catholic Clergy Sexual Abuse Meets the Civil Law*, 31 Fordham Urb. L.J. 549, 561 (2004) (explaining that sexual relationships between adult clerics and age-appropriate victims occur "because there is a power differential"). The clergy-sexual-conduct statute not only criminalizes certain sexual relationships between clergy and parishioners, but it could also criminalize certain sexual relationships for physicians, psychologists, nurses, chemical dependency counselors, social workers, marriage and family therapists, mental health service providers, or others persons who provide psychotherapy; government and private correctional employees; and masseuses. Minn.Stat. § 609.344, subd. 1(h), (j), (k), (m), (n), (o) (2012). Similar to the statutes in *Bowen* and *Ideal Life Church of Lake Elmo*, the Legislature did not single out clergy mem-

bers because of their affiliation with a religious group. Instead, the Legislature identified the existence of a power imbalance between clergy members (or purported clergy members) and their parishioners in certain situations—similar to power imbalances created between other professionals and their clients.

Citing *McDaniel v. Paty*, 435 U.S. 618, 629, 98 S.Ct. 1322, 55 L.Ed.2d 593 (1978), Wenthe also argues that the clergy-sexual-conduct statute inhibits religion because it prevents him from exercising "a civil right"—the right to have a sexual relationship with a friend. The clergy-sexual-conduct statute does not deny clergy members the right to engage in a sexual relationship with a friend. Instead, the statute criminalizes the behavior of clergy members who use their position to enter into a sexual relationship with individuals the Legislature has determined to be vulnerable—those who seek religious or spiritual aid, advice, or comfort in private. For the foregoing reasons, we conclude that the primary effect of the clergy-sexual-conduct statute does not inhibit religion.

*Excessive Government Entanglement with Religion*

■ The third prong of the *Lemon* test prohibits state action that excessively entangles the government with religion. *Lemon*, 403 U.S. at 613, 91 S.Ct. 2105. Under this prong, "a state may not inquire into or review the internal decisionmaking or governance of a religious institution." *Odenthal v. Minn. Conference of Seventh-Day Adventists*, 649 N.W.2d 426, 435 (Minn.2002) (citing *Jones v. Wolf*, 443 U.S. 595, 602, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979)). No entanglement problem exists, however, when civil courts use neutral principles of law—rules or standards that have been developed and are applied without particular regard to religious institutions or doctrines—to resolve disputes even though those disputes involve religious institutions or actors.[3] *Jones*, 443 U.S. at 602–04, 99 S.Ct. 3020; *Odenthal*, 649 N.W.2d at 435; *Hill–Murray Fed'n of Teachers v. Hill–Murray High School*, 487 N.W.2d 857, 863–64 (Minn.1992); *Piletich v. Deretich*, 328 N.W.2d 696, 700–01 (Minn. 1982).

The clergy-sexual-conduct statute does not create an excessive entanglement with religion because it applies neutral principles of law and regulates only secular aspects of clergy-parishioner relationships. *See Odenthal*, 649 N.W.2d at 438 (holding that an inquiry into whether a minister was providing "assessment, treatment, or counseling" was not excessively entangled with religion because it did not require "any inquiry into the religious aspect of the relationship"). Under the statute, the State must prove the complainant sought or received "advice, aid, or comfort" from a clergy member. Minn.Stat. § 609.344, subd. 1(*l* ) (i). But "advice, aid, [and] comfort" are secular concepts that a jury or court can assess without delving into religious doctrine. *See Bussmann*, 741 N.W.2d at 89–92 (Hanson, J., plurality opinion); *id.* at 98–99 (Anderson, Russell, C.J., dissenting); *Cf. People v. Campobello*, 348 Ill.App.3d 619, 284 Ill.Dec. 654, 810 N.E.2d 307, 316 (2004) ("The State has neither expressed nor implied an aim to determine for itself whether defendant violated canon law, much less to override any determination of the Diocese on that point."). For example, a court can examine whether a clergy member is acting as a "helper," "advisor," or "comforter," according to secular notions of those relation-

**3.** In *Bussmann*, we were evenly divided on the issue of whether section 609.344, subdivision 1(*l* )(ii), facially violates the Establishment Clause because it creates an excessive entanglement with religion. 741 N.W.2d at 87–92 (Hanson, J., plurality opinion).

ships. *See The American Heritage Dictionary* 840 (3d ed.1996) (defining a "helper" as "one that helps; an assistant"). And the substance of the particular advice sought or given, and the religious basis for that advice, are not relevant to the analysis of whether the defendant has violated the statute.

Wenthe argues, however, that the clergy-sexual-conduct statute does not apply neutral principles of law because it creates an "irrebuttable presumption that all clergy advisee relationships have the same religious attributes." Wenthe asserts that impermissible non-secular presumptions include: (1) that a clergy member is always in a position of power over an advisee; (2) that a clergy member is put into that position of power when they are a religious or spiritual advisor; (3) that religious or spiritual advice renders an advisee incapable of consenting to sex; and (4) that consent to sex is always legally ineffective when the advisee is receiving religious or spiritual advice, aid, or comfort.

But our precedent already acknowledges that coercive power imbalances exist in some of the secular relationships at issue in section 609.344, subdivision 1. *See, e.g., Schlobohm v. Spa Petite, Inc.,* 326 N.W.2d 920, 925 (Minn.1982) (noting that a disparity of bargaining power may have occurred if a "health *adviser*" had directed the appellant to participate in a gym program); *cf.* Doyle & Rubino, *supra,* at 561 (discussing power imbalances between clergy and parishioners). Recognition of such power imbalances is based on neutral principles. Accordingly, that the Legislature recognized that this same type of power imbalance exists in the clergy-parishioner relationship, as in the other similar relationships at issue in the statute, does not create entanglement problems. *See Jones,* 443 U.S. at 602–04, 99 S.Ct. 3020; *Odenthal,* 649 N.W.2d at 435.

Finally, Wenthe argues that the clergy-sexual-conduct statute excessively entangles the State with religion because it requires an inquiry into whether an individual is seeking *religious* or *spiritual* advice, aid, or comfort. In *Bussmann,* the defendant made a similar argument, and we unanimously concluded that it was not improper to require courts to "decide whether [the] advice given by a clergy member [was] of a religious or spiritual nature" because we have "recognized that such a decision involves a narrow fact issue that courts can decide without excessive entanglement." 741 N.W.2d at 89 n. 5 (Hanson, J., plurality opinion); *id.* at 89–92 (plurality opinion joined by Anderson, Paul H., J. and Anderson, G. Barry, J.) (concluding that courts can determine whether a complainant sought or received religious advice or aid by reference to secular principles); *id.* at 96–100 (Anderson, Russell, C.J., dissenting) (same). We have also affirmed a similar inquiry when district courts determine whether a communication between a member of the clergy and a parishioner was "religious or spiritual" in the context of the clergy-evidentiary privilege. *See, e.g., State v. Rhodes,* 627 N.W.2d 74, 85–86 (Minn.2001); *State v. Black,* 291 N.W.2d 208, 216 (Minn.1980), *abrogated on other grounds by State v. Jones,* 556 N.W.2d 903, 909 n. 4 (Minn. 1996); *see also Ideal Life Church of Lake Elmo,* 304 N.W.2d at 315 (approving the use of a multifaceted test to determine whether an institution is a "church" for tax purposes). Because a jury or court can apply secular standards to determine whether advice, aid, or comfort was of a religious or spiritual nature, without testing or examining the validity of or basis for any particular aspect of the religious teaching or doctrine, the clergy-sexual-conduct statute is not excessively entangled with religion.

For all of these reasons, we conclude that the clergy-sexual-conduct statute does not excessively entangle the State with religion.

Based on our application of the *Lemon* test, we hold that section 609.344, subdivision 1(*l*)(i), does not facially violate the Establishment Clause.

### B.

■ We turn next to consider whether the clergy-sexual-conduct statute is unconstitutional as applied to Wenthe. We recognized in *Bussmann* that the *Lemon* test provides the framework for an as-applied challenge to the clergy-sexual-conduct statute. *Bussmann,* 741 N.W.2d at 94 (Hanson, J., majority opinion). In *Bussmann,* we held that the application of section 609.344, subdivision 1(*l*)(ii) to Bussmann violated the Establishment Clause because of the excessive entanglement of religion in his case. 741 N.W.2d at 92–95. (Hanson, J., majority opinion).

On appeal, the State argues that this case is materially different from *Bussmann* in terms of the State's evidence and theory of the case. For his part, Wenthe contends that just as we concluded that the clergy-sexual-conduct statute was unconstitutional as applied to the clergy member in *Bussmann,* it is likewise unconstitutional as applied here. Specifically, quoting *Bussmann,* Wenthe argues that the evidence at his trial allowed the religious doctrine of the Catholic Church to become entangled with the elements needed to prove a violation of the clergy-sexual-conduct statute.

In reaching our conclusion of excessive entanglement in *Bussmann,* we highlighted five categories of evidence that the State admitted at trial: (1) the power imbalance resulting from the power of priests over parishioners; (2) the official policies of the Catholic Church regarding pastoral care; (3) concerns within the Catholic Church regarding sexual misconduct; (4) testimony relating to a church's response to allegations of sexual misconduct; and (5) the religious training the priest received. *Id.* at 93–94. While we focused on these categories of evidence, our overarching concern in *Bussmann* was whether the jury found the priest guilty because he violated Catholic Church doctrine and not because the State proved beyond a reasonable doubt that he committed acts the clergy-sexual-conduct statute prohibits. *See id.* at 92 (noting that the court was "concerned that the state's use of these witnesses" who testified about religious doctrine "engrafted religious standards onto the statute"); *id.* at 94 (explaining that the court allowed "the religious doctrine of the Catholic Church to become entangled with the criteria set out in the clergy sexual conduct statute for determining the criminality of Bussmann's conduct"). The evidence we highlighted raised an entanglement concern because it "engrafted religious standards onto the statute," "was irrelevant to any secular standard," and "was highly prejudicial." *Id.* at 92–93. Based on this analysis, we concluded that religion became excessively entangled in Bussmann's trial, in violation of the Establishment Clause. *Id.* at 92–94.

■ The concern at issue in *Bussmann*—that the jury may have assessed the criminality of the defendant's conduct based on religious doctrine and not on the secular elements in the statute—is not present in this case. That the State did not attempt to shift the jury's focus away from the secular elements in the clergy-sexual-conduct statute and onto religious doctrine is made clear when we compare the evidence admitted here in each of the five categories of evidence we highlighted

in *Bussmann* with the evidence admitted in *Bussmann.*[4]

Regarding the first category of evidence, in *Bussmann* we were concerned with testimony by a Catholic priest and a Catholic counselor about the religious power of priests. 741 N.W.2d at 93. In particular, we were troubled by the following testimony by a Catholic priest:

> [T]he whole reason we're ordained is to exercise power in the name of the church. That power may be one of the most beautiful and fundamental, which is to change bread and wine into the body and blood of Christ. . . . It may be the power that comes from special access to people as pastors do when we assist people with death, with family crisis, with depression, with a variety of other issues. . . . What I train our clergy is that our long experiences of church is that that power, beautiful and important, central as it is to us, is also inherently dangerous because it can be misused for purposes other than what it's entrusted to us for.

*Id.* We also found the following testimony concerning abuses of power in religious terms—"pastoring by seduction"—troublesome:

> [S]eduction means essentially any form of pastoring, the end of which is only to deepen the connection between the pastor and the person rather than to lead that person beyond the pastor to Jesus Christ. This would include sexual seduction, drawing people into one's self-pity and a variety of other violations of

that fundamental relationship with Jesus.

*Id.*

The "power of priests" evidence admitted in *Bussmann* "bolstered the state's claims by informing the jury that the Church condemned Bussmann's behavior." *Id.* at 92–93. Wenthe submits that A.F.'s testimony regarding her view of her relationship with Wenthe, the admission of A.F.'s letter to the archbishop, and the State's characterization of A.F. and Wenthe's relationship raise similar concerns. But all of this evidence was relevant to determining whether Wenthe was acting as a spiritual "advisor," "comforter," or "helper," or as he contended as a "friend" and "lover." Unlike in *Bussmann,* this evidence was connected to the secular standard of determining the nature of Wenthe and A.F.'s relationship. *Id.* at 93. This evidence also did not inform the jury of the Catholic Church's views but elicited A.F.'s personal understanding of the scope of the relationship and her personal beliefs about priests. In short, the State's evidence in this case does not raise the same entanglement concerns regarding the "power of priests" evidence as were present in *Bussmann.*

The second and third types of evidence about which we articulated concern in *Bussmann* related to a church's policy on counseling and pastoral care, and a church's concerns about sexual misconduct. *Id.* at 94. Wenthe asserts that the district court impermissibly allowed evidence regarding pastoral care policies and the Catholic Church's view of sexual mis-

---

4. To support his claim that the clergy-sexual-conduct statute violates the Establishment Clause as applied, Wenthe relies on both evidence that the State admitted and evidence that Wenthe admitted, either through his own witnesses or by his cross-examination of the State's witnesses. But the only evidence that is relevant to assessing whether the applica-

tion of the clergy-sexual-conduct statute to the defendant violates the Establishment Clause is the evidence "the district court allowed the *state* to introduce." *Bussmann,* 741 N.W.2d at 94 (emphasis added). Accordingly, we limit our as-applied analysis to the evidence that the State introduced.

conduct by priests. Wenthe points to testimony from church members stating that sex between a priest and a parishioner is "unthinkable" or "inappropriate" and testimony from other church officials about appropriate boundaries between priests and parishioners. But the minimal amount of evidence admitted by the State regarding the policies of the Catholic Church on pastoral care was both quantitatively and qualitatively distinguishable from the evidence admitted in *Bussmann. See Odenthal,* 649 N.W.2d at 436 (explaining that allowing a party to base an entire negligence case on a church's handbook would raise serious excessive entanglement issues).

The evidence on which Wenthe relies with regard to the church's concerns about sexual misconduct is also dissimilar to the evidence in *Bussmann.* In *Bussmann,* church leaders testified about increased sexual misconduct in priest-parishioner relationships and explained that one of the church's solutions to the problem was to name the perpetrator and declare his conduct wrongful. 741 N.W.2d at 93. This evidence amounted to providing "a means by which the Church was able to vouch for the credibility" of the victim and suggest to the jury that a conviction would assist the church in resolving the problem of offending clergy members. *Id.* Here, there were indications from some church members that the relationship between Wenthe and A.F. was inappropriate. But much of the evidence simply recalled A.F.'s description of the relationship; it did not discuss church doctrine. Additionally, this evidence did not come from a religious leader and the testimony the State offered in this area consisted of only a few sentences in the entire trial transcript. In sum, the admission of evidence relating to the church's concerns about sexual misconduct did not amount to the church vouching for the credibility of A.F.

or asking the jury to resolve a sexual-misconduct problem within the church.

The fourth type of evidence that we relied on in concluding that there was an entanglement problem in *Bussmann* was evidence regarding the church's response to the sexual relationship that gave rise to the criminal charges. 741 N.W.2d at 93. In *Bussmann,* we were concerned about the admission of evidence regarding complaints received by the church because it informed the jury that the church condemned the priest's behavior and was "akin to victim impact testimony." *Id.* Wenthe points to A.F.'s testimony about the church's response to her complaint; a priest's testimony that described a meeting between the priest and Wenthe, in which Wenthe admitted both that he had an "illicit relationship" with and provided "pastoral care" for A.F.; testimony regarding meetings with the archbishop; and a victim-advocate describing her meeting with A.F.

Some of this evidence, such as a priest's testimony describing a meeting in which Wenthe made admissions about his relationship with A.F., was relevant to the secular standards of whether Wenthe and A.F. had sexual relations and whether Wenthe was providing spiritual advice or comfort to A.F. when their sexual relations occurred. In addition, much of the evidence in this category was relevant to the secular purpose of explaining why A.F. delayed reporting Wenthe's conduct to police. *See State v. Obeta,* 796 N.W.2d 282, 289–94 (Minn.2011) (discussing relevance to evaluating complainant's credibility of evidence explaining the reasons why a complainant delayed reporting a sexual assault); *Van Buren v. State,* 556 N.W.2d 548, 552 (Minn.1996) (same). And to the extent that the evidence at issue came from church officials, these witnesses limited their testimony to discussion of facts

relevant to a prosecution under the clergy-sexual-conduct statute. The evidence in this category therefore was not similar to the "victim impact" evidence we found troubling in *Bussmann*.

Finally, we articulated potential entanglement concerns in *Bussmann* over evidence relating to a clergy member's training. 741 N.W.2d at 93. Wenthe asserts that evidence of his training was admitted at trial, creating excessive entanglement between the State and religion. But evidence regarding Wenthe's training was submitted, in part, by Wenthe and not the State. *See Bussmann*, 741 N.W.2d at 94. To the extent the State inquired as to Wenthe's training on cross-examination, the State did briefly stray from purely secular matters. For example, the State suggested that it was "wrong" for Wenthe to have had sex with a parishioner "because [Wenthe] took a vow." In response, Wenthe acknowledged that he "took a vow." But given the entire scope of the State's cross-examination, which focused principally on eliciting testimony relevant to the elements of the crime, this limited problematic examination does not create an entanglement problem.

After our careful review of the record, including the State's theory and the categories of evidence Wenthe contends run afoul of our analysis in *Bussmann*, we conclude that religion was not excessively entangled in Wenthe's trial. The evidence in this case does not raise the concern that animated the result in *Bussmann*—that the jury would find the defendant guilty not because he violated the statute, but because he violated church doctrine. *Bussmann*, 741 N.W.2d at 94. Indeed, if

religious doctrine had influenced the jury's determination of guilt in this case, the jury would have found Wenthe guilty of both counts. The fact that the jury acquitted Wenthe of one count and found him guilty of the other supports the inference that the jury was properly focused on the elements in the statute. *Cf. State v. Prtine*, 784 N.W.2d 303, 316 (Minn.2010) (noting that the fact that "the jury acquitted Prtine of first-degree premeditated murder ... suggests that the [prosecutor's] misstatement," which was argued in support of the premeditated murder charge "did not influence the jury's decision.").

Moreover, the vast majority of evidence the State admitted had relevant, secular purposes, and the State focused on proving that Wenthe engaged in sexual conduct with A.F. that is criminal under the clergy-sexual-conduct statute. To the extent the State occasionally strayed away from purely secular evidence, the nature of that evidence is qualitatively and quantitatively different from the evidence the State presented in *Bussmann*. Based on our review and analysis of the record, we hold that Wenthe did not demonstrate that the clergy-sexual-conduct statute violates the Establishment Clause as applied in this case.[5]

Affirmed in part, reversed in part, and remanded.

DIETZEN, J., took no part in the consideration or decision of this case.

WRIGHT, J., took no part in the consideration or decision of this case.

---

5. In addition to his constitutional challenges, Wenthe raised a number of trial errors that the court of appeals did not address. *See State v. Wenthe*, 822 N.W.2d 822, 830 (Minn. App.2012). Because we have reversed the court of appeals' conclusion that Wenthe is entitled to a new trial based on an as-applied Establishment Clause violation, we remand to the court of appeals to consider the additional issues that Wenthe raised in his appeal.

ANDERSON, Justice (concurring).

I join in the majority opinion but write separately to note my concerns about the way certain evidentiary matters were handled at trial. The majority opinion notes, but properly says very little about, a pretrial agreement between the defense and prosecution to "stay totally away from" certain issues including Catholic doctrine. The record, however, contains detailed discussions about Catholic theology, including testimony about celibacy requirements for priests, admission of which into evidence appears to be inconsistent with the pretrial agreement or irrelevant to this criminal prosecution, or both. I agree that the admission of this evidence does not amount to excessive entanglement, and whether it is some form of trial error is, of course, not before our court on this appeal. But of concern is that we have now been presented, for the second time, first in *Bussmann* and now here, with a record that contains, at a minimum, unnecessary exploration of theological detail in a criminal sexual conduct prosecution and that, in turn, in the appropriate case, may raise questions about the fairness of the underlying trial. *See generally State v. Bussmann,* 741 N.W.2d 79 (Minn.2007).

PAGE, Justice (dissenting).

Minnesota Statutes § 609.344, subd. 1(*l*)(i) (2012), provides that a member of the clergy who engages in sexual penetration with another person is guilty of criminal sexual conduct if the penetration occurred during a meeting in which that person sought or received religious or spiritual advice, aid, or comfort. *Id.* The court concludes that the statute is constitutional both facially and as it applies to Wenthe. Because I conclude that Minn. Stat. § 609.344, subd. 1(*l*)(i), is unconstitutional on its face and as applied to Wenthe, I respectfully dissent. *See State v. Buss-*

*mann,* 741 N.W.2d 79, 95 (Minn.2007) (joining in parts II.A and III of opinion of Hanson, J.).