*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0605**

LaVonne Pfeil,
Individually and as Trustee for Heirs of Henry Pfeil, deceased,
Appellants,

vs.

St. Matthews Evangelical Lutheran Church
of the Unaltered Augsburg Confession of Worthington,
Nobles County, Minnesota, et al.,
Respondents.

**Filed January 12, 2015
Affirmed
Chutich, Judge**

Nobles County District Court
File No. 53-CV-13-817

Zorislav R. Leyderman, The Law Office of Zorislav R. Leyderman, Minneapolis, Minnesota (for appellants)

Ken D. Schueler, Jennifer M. Peterson, Dunlap & Seeger, P.A., Rochester, Minnesota; and

Timothy J. O'Connor, William L. Davidson, Lind, Jensen, Sullivan & Peterson, P.A., Minneapolis, Minnesota (for respondents)

Considered and decided by Chutich, Presiding Judge; Stauber, Judge; and Reilly, Judge.

UNPUBLISHED OPINION

**CHUTICH**, Judge

Appellants LaVonne and Henry Pfeil challenge the district court's dismissal of their defamation claims against St. Matthew Evangelical Lutheran Church and its pastors. The district court ruled that it lacked subject-matter jurisdiction under the ecclesiastical abstention doctrine. Because any judicial inquiry into the truth of statements made during a church disciplinary proceeding would create an excessive entanglement with the church that would violate the First Amendment, we affirm.

## FACTS

Appellants LaVonne and Henry Pfeil, an elderly couple who lived in Worthington, were longstanding members of St. Matthew.[1] In August 2011, the Pfeils were excommunicated from St. Matthew. The following September, Pastor Thomas Braun and Pastor Joe Behnke held a special voter's meeting at St. Matthew to determine whether the voting members of the church would affirm the Pfeils' excommunication. The Pfeils and approximately 89 other church members attended the meeting.

At the special voter's meeting, Pastor Braun read from a prepared document and made numerous statements about the Pfeils. These statements included:

- The Pfeils were "actively involved in slander, gossip, and speaking against [Pastor Braun, Pastor Braun's wife, St. Matthew, and Pastor Behnke]."
- The Pfeils had "intentionally attacked, questioned, and discredited the integrity" of Pastor Braun, Pastor Behnke, and other St. Matthew leaders.

---

[1] The respondents state that the church's proper name is "St. Matthew" and not "St. Matthews," as is listed in the caption to the Pfeils' action.

- Other people had seen the Pfeils display "anger and disrespect" towards Pastor Braun.
- The Pfeils had publicly engaged in "sinful behavior" inside and outside St. Matthew.
- The Pfeils had engaged in behavior unbecoming of Christians.
- The Pfeils had "refused to meet for the purpose of confession and forgiveness."
- The Pfeils had "refused to show respect" towards servants of God and St. Matthew leadership.
- The Pfeils had "led other people into sin."
- The Pfeils had engaged in "slander and gossip" and refused to stop.
- The Pfeils had "refused to follow the words and teachings of God."

During the same meeting, Pastor Braun also published and displayed a second document containing statements about the Pfeils. The published statements included the following:

- There had been "numerous reports" accusing the Pfeils of engaging in "slander" against Pastor Braun and his wife prior to their arrival at St. Matthew.
- Pastor Braun and St. Matthew had received "monthly reports" accusing the Pfeils of "slander" against Pastor Braun and "discredit[ing]" the ministry of Pastor Braun and St. Matthew.
- On December 6, 2010, the Pfeils participated in a meeting during which "reports of slander were [presented to the Pfeils]."
- Since January 26, 2011, Pastor Braun and St. Matthew had received "numerous monthly reports," from both members and nonmembers of St. Matthew, accusing the Pfeils of "slander and gossip . . . against the leadership and ministry of [St. Matthew]."
- In July 2011, the Pfeils "openly and intentionally attempted to discredit the integrity of the pastors and church leaders [of St. Matthew]."
- Since August 2, 2011, Pastor Braun and St. Matthew had received additional reports accusing the Pfeils of "slander and gossip."
- Since August 2, 2011, the Pfeils engaged in "breaches of confidentiality."
- The Pfeils had "publically and intentionally perpetuated false information and caused . . . dissention for the work and ministry of St. Matthew."

3

At the same meeting, Pastor Braun and Pastor Behnke distributed a ballot for the attendees to vote on whether to affirm the Pfeils' excommunication. The statements printed on the ballot included:

- The Pfeils had refused "to stop their slander and gossip."
- The Pfeils had led "other people into sin by their behavior."
- The Pfeils had refused "to follow the commands of God's Word."
- The Pfeils had "[p]ublically attempt[ed] to discredit the integrity of the pastors and church leaders."
- The Pfeils refused "to show respect to called and ordained servants of the Word."
- The Pfeils had refused "to meet with both pastors and the Board of Elders for the purpose of confession and forgiveness."

In March 2012, the Pfeils and approximately ten other people attended a synod panel hearing.[2] At St. Matthew, the synod panel is part of the dispute-resolution process set forth in the bylaws of the church; the panel is responsible for reviewing decisions of the church congregation regarding discipline. During this hearing, Pastor Behnke alleged that the Pfeils had recently accused him of stealing money from St. Matthew.

The Pfeils sued respondents St. Matthew, Pastor Behnke, and Pastor Braun (collectively, the Church), alleging that the Church's statements injured their character and reputation in their small community. The Pfeils' complaint specifically alleges the Church's statements were defamatory, defamation per se, and that the Church was negligent in making false and defamatory statements about the Pfeils. Henry Pfeil died

---

[2] "Synod" refers to "an ecclesiastical council." *The American Heritage Dictionary* 1766 (5th ed. 2011).

4

before the complaint for this lawsuit was filed, and his wife, LaVonne Pfeil, continued his defamation claims in his name as trustee of his estate.

In September 2013, the Church moved to dismiss under Minnesota Rule of Civil Procedure 12.02(e), asserting that the Pfeils failed to state a claim upon which relief can be granted. In its motion, the Church argued that Henry Pfeil's claim did not survive his death, the Pfeils did not plead their defamation claims with the required level of specificity, and the Pfeils did not allege any actionable defamatory statements.

In December 2013, the Church filed a second motion to dismiss under Minnesota Rule of Civil Procedure 12.08(c) for lack of subject-matter jurisdiction. In this motion, the Church argued that all the alleged defamatory statements pertained to church governance, membership, and/or discipline proceedings, and therefore the district court lacked subject-matter jurisdiction under the Establishment Clause of the First Amendment.

In its well-reasoned order, the district court (1) granted the Church's motion to dismiss Henry Pfeil's claims under rule 12.02(e), determining that his defamation claims did not survive his death; (2) denied the Church's motion to dismiss LaVonne Pfeil's claims under rule 12.02(e), determining that she pleaded sufficient facts to maintain her claims; and (3) dismissed all of the Pfeils' claims under rule 12.08(c), determining that the ecclesiastical abstention doctrine barred the court from exercising subject-matter jurisdiction over the dispute.

In its interpretation of the ecclesiastical abstention doctrine, the district court relied on our decision in *Schoenhals v. Mains*, 504 N.W.2d 233, 235 (Minn. App. 1993). The

district court reasoned that because all of the alleged defamatory statements "were made in the context of internal church governance and involve the reasons and motives for disciplining [the Pfeils]," the court lacked subject-matter jurisdiction under *Schoenhals*.

Both parties appealed. The Pfeils contend that the district court erroneously dismissed their claims for lack of subject-matter jurisdiction and erroneously dismissed Henry Pfeil's claims for failing to survive his death. The Church argues that the district court erred by not dismissing LaVonne Pfeil's claims for failure to state an actionable claim.

## D E C I S I O N

The Pfeils argue that the district court erred in dismissing their claims for lack of subject-matter jurisdiction because *Schoenhals* departs from prior Minnesota caselaw and other relevant authorities. The Church responds, and we agree, that *Schoenhals* is dispositive, and the district court properly applied the ecclesiastical abstention doctrine to dismiss the Pfeils' claims.

### *Ecclesiastical Abstention Doctrine*

Subject-matter jurisdiction refers to the court's power to hear and to determine cases. *League of Women Voters Minn. v. Ritchie*, 819 N.W.2d 636, 643 (Minn. 2012). Whether subject-matter jurisdiction exists is a question of law that we review de novo. *In re Civil Commitment of Giem*, 742 N.W.2d 422, 425-26 (Minn. 2007).

The Establishment Clause of the First Amendment says that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I.[3] The Establishment Clause applies to the states through the Due Process Clause of the Fourteenth Amendment, and it "forbids state action that: (1) lacks a secular purpose; (2) has the primary effect of advancing or inhibiting religion; or (3) fosters excessive entanglements with religion (*Lemon* test)." *State v. Wenthe*, 839 N.W.2d 83, 87 (Minn. 2013) (citing *Lemon v. Kurtzman*, 403 U.S. 602, 612-13, 91 S. Ct. 2105, 2111 (1971)).

The third prong of the *Lemon* test, excessive entanglement, prohibits a court from inquiring into or reviewing "the internal decisionmaking or governance of a religious institution." *Odenthal v. Minn. Conference of Seventh-Day Adventists*, 649 N.W.2d 426, 435 (Minn. 2002). "No entanglement problem exists, however, when civil courts use neutral principles of law—rules or standards that have been developed and are applied without particular regard to religious institutions or doctrines—to resolve disputes even though those disputes involve religious institutions or actors." *Wenthe*, 839 N.W.2d at 90.

Under the ecclesiastical abstention doctrine, courts lack subject-matter jurisdiction if the disputed topic is "strictly and purely ecclesiastical in its character, [a] matter over which the civil courts exercise no jurisdiction, [a] matter which concerns theological controversy, church discipline, ecclesiastical government, or the conformity of the

---

[3] Similarly, the Minnesota Constitution gives every citizen the right to worship "according to the dictates of his own conscience" and requires that the state not control, interfere, or give preference by law to "any religious establishment or mode of worship." Minn. Const. art. I, § 16.

members of the church to the standard of morals required of them." *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 713-14, 96 S. Ct. 2372, 2382 (1976) (emphasis omitted) (quotation omitted).

In *Schoenhals*, we interpreted the ecclesiastical abstention in a strikingly similar factual situation. 504 N.W.2d at 233. The Schoenhals received a letter from their pastor terminating their membership from the church. *Id.* at 234. The pastor read the letter to the entire congregation and discussed it separately with the Schoenhalses' son, who was also a member of the church. *Id.* at 235. The letter set forth the following reasons for terminating the Schoenhalses' membership with the church:

1. A lack of financial stewardship with consistency and faithful tithing and offering over a given period of time.
2. A desire on your part to consistently create division, animosity and strife in the fellowship.
3. Direct fabrication of lies with the intent to hurt the reputation and the establishment of Faith Tabernacle of Truth Church and congregation.
4. Backbiting, railing accusations, division, lying, are some of the most serious sins found in the Bible. Where, by all appearances and related conversations, you have fallen into all of the categories.

*Id.* at 234.

The Schoenhals sued the church and its pastor alleging defamation, among other claims. *Id.* at 235. The district court granted summary judgment to the church and dismissed the Schoenhalses' defamation claim under the ecclesiastical abstention doctrine. *Id.* at 235. We affirmed the dismissal and held that an examination as to the truth of the pastor's statements would "require an impermissible inquiry into Church

8

doctrine and discipline" in violation of the Establishment Clause of the First Amendment. *Id.* at 236.

We also specifically acknowledged that one of the pastor's statements—the accusation that the Schoenhals had fabricated lies intended to hurt the reputation and establishment of the church—appeared unrelated to church doctrine on its face. *Id.* But we nevertheless reasoned that the statement "relate[d] to the Church's reasons and motives for terminating the Schoenhals[es]' membership" and therefore any examination into "those reasons and motives would also require an impermissible inquiry into Church disciplinary matters." *Id.* In addition, we noted that the letter was disseminated only to other congregation members, which strengthened our conclusion that the pastor's statements were related and limited to internal church disciplinary proceedings. *Id.*

The statements here, like the statements in *Schoenhals*, are all related to the Church's motives and reasons for excommunicating the Pfeils. Any examination as to the truth of these statements would be an impermissible inquiry into church doctrine under the First Amendment. *Id.* at 236. Adjudicating the truth of statements concerning sin and Christian doctrine cannot be done without impermissibly intruding on issues that are "strictly and purely ecclesiastical in [their] character." *Milivojevich*, 426 U.S. at 713, 96 S. Ct. at 2382 (quotation omitted).

At oral argument, the Pfeils' counsel conceded that we could not examine the truth of the statements concerning "sin" and Christian doctrine without violating the Establishment Clause. Nevertheless, the Pfeils contend that four categories of statements—the breach of confidentiality, lying or perpetuating false information,

9

accusing Pastor Behnke of stealing money, and the reported complaints of other congregation members concerning the Pfeils' behavior—can be adjudicated true or false based on secular, legal principles.

But this argument overlooks why the statements were made and the context in which they were made. In *Schoenhals*, we declined to inquire into any statements that related to a church's reasons and motive for terminating membership, even if the alleged defamatory statements appear unrelated to church doctrine on their face. 504 N.W.2d at 236. Likewise here, any examination into whether the statements were truthful would be an "impermissible inquiry into Church doctrine and discipline," *id.*, because the statements were directly related to the Church's reasons for excommunicating the Pfeils. Furthermore, these statements all occurred during the context of internal church disciplinary proceedings—the special voter's meeting in September and the synod panel hearing in March—that are specifically designed to determine membership status at St. Matthew.

The Pfeils next argue that we should "modify" *Schoenhals* because it (1) improperly departs from *Black v. Snyder*, 471 N.W.2d 715 (Minn. App. 1991), *review denied* (Minn. Aug. 29, 1991); (2) creates an absolute immunity for religious leaders unrecognized in state and federal law; and (3) enhances religion in violation of the First Amendment. None of these assertions are persuasive.

In *Black*, the appellant was a female pastor who claimed that her supervisor, a male pastor, repeatedly made unwelcome sexual advances toward her. *Id.* at 717-18. Less than three months after reporting the sexual harassment to the Minnesota

10

Department of Human Rights, the appellant was fired for her "inability to conduct the pastoral office efficiently in [the] congregation in view of local conditions." *Id.* at 718. She sued the church and pastor for sexual harassment and defamation, among other claims. *Id.*

We dismissed the appellant's defamation claim because we determined that any inquiry into the church's stated reason for her discharge—her inability to conduct her ministry efficiently—would be an impermissible inquiry into "an essentially ecclesiastical concern." *Id.* at 720. We permitted the appellant to pursue her sexual harassment claim because it was unrelated to her pastoral qualifications or issues of church doctrine and the remedy that she claimed would not require extensive court oversight. *Id.* at 721.

The Pfeils claim that *Schoenhals* strays from our holding in *Black* because the defamation claim in *Schoenhals* could have been resolved on neutral legal principles like the sexual harassment claim in *Black*. We disagree. *Schoenhals* aligns with *Black* because both decisions characterize the discharge of a person—whether an employee or church member—as a matter that concerns church governance and discipline over which civil courts have no subject-matter jurisdiction. *Schoenhals*, 504 N.W.2d at 236; *Black*, 471 N.W.2d at 720.

The Pfeils also contend that *Schoenhals* creates an absolute immunity for religious leaders that is not recognized in state and federal law and it enhances religion in violation of the First Amendment. Contrary to the Pfeils' assertions, *Schoenhals* does not create an absolute immunity for religious leaders; it merely recognizes that courts cannot interfere

11

with a church's disciplinary proceeding of its own members. As the United States Supreme Court has stated, issues of church discipline are "strictly and purely ecclesiastical . . . over which the civil courts exercise no jurisdiction." *Milivojevich*, 426 U.S. at 713-14, 96 S. Ct. at 2382 (quotation omitted). And if church leaders are accorded any special protection, it is only when the principles of the First Amendment require it. *See id.*; *see also Schoenhals*, 504 N.W.2d at 236.

Finally, the Pfeils argue that we should adopt the reasoning of the Pennsylvania Supreme Court in *Connor v. Archdiocese of Philadelphia*, 975 A.2d 1084 (Pa. 2009). This court, however, is not bound by the decisions of other state courts. *In re Welfare of Child of E.A.C.*, 812 N.W.2d 165, 174 (Minn. App. 2012), *review denied* (Minn. Mar. 27, 2012). And when binding Minnesota precedent is directly on point, we cannot disregard our own authority for that of other states. Accordingly, we decline to follow Pennsylvania caselaw here.

In concluding that the Pfeils' claims must be dismissed, we do not minimize the concerns that brought them to court. We recognize that LaVonne Pfeil, a lifelong resident of Worthington and longstanding member of the St. Matthew congregation, believes that the Church's statements besmirched her reputation and that of her deceased husband, Henry Pfeil, a grievous injury to the family name. But the separation of church and state, a principle enshrined in the Minnesota and United States Constitutions, prevents a district court from determining the merits of the Pfeils' dispute with their former church. Our decision here does not excuse any defamatory behavior that may have occurred in a sacred setting; it merely honors the separation of church and state by

12

avoiding secular intrusion into the heart of religious concerns: who may be a member of the church; what standards of behavior are required of them; and how and when members may be disciplined.

In sum, because the ecclesiastical abstention doctrine bars the court from inquiring into excommunication proceedings under these circumstances, the Pfeils' claims were properly dismissed for lack of subject-matter jurisdiction. Given our conclusion above, we need not address the Pfeils' remaining arguments and the Church's cross-appeal.

**Affirmed.**