STATE OF MINNESOTA

IN SUPREME COURT

A12-0263

Court of Appeals                                                                 Anderson, J.
                                                                  Dissenting, Page, J.
                                          Took no part, Dietzen and Wright, JJ.

State of Minnesota,

                    Appellant,

vs.                                                                    Filed:  June 24, 2015
                                                          Office of Appellate Courts

Christopher Thomas Wenthe,

                    Respondent.

_____

Lori Swanson, Attorney General, Saint Paul, Minnesota; and

John J. Choi, Ramsey County Attorney, Peter R. Marker, Assistant Ramsey County
Attorney, Saint Paul, Minnesota, for appellant.

Paul Engh, Minneapolis, Minnesota, for respondent.
_____

S Y L L A B U S

1.      The district court's allegedly erroneous unanimity instruction did not affect
respondent's substantial rights.

2.      The crime of clergy sexual conduct, Minn. Stat. § 609.344, subd. 1(*l*)
(2014), does not require the State to prove that the clergy member had knowledge that the
complainant sought or received religious or spiritual advice, aid, or comfort.

1

3.     The district court did not abuse its discretion by denying respondent's motion to admit evidence of the complainant's sexual history.

Reversed.

O P I N I O N

ANDERSON, Justice.

Respondent Christopher Thomas Wenthe was convicted of third-degree criminal sexual conduct, Minn. Stat. § 609.344, subd. 1(*l*)(i) (2014), for sexually penetrating A.F.—a member of the parish where Wenthe served as a priest—at a single meeting at which A.F. sought spiritual counsel.  Appellant State of Minnesota seeks review of three issues:  (1) whether the district court committed plain error affecting Wenthe's substantial rights by failing to provide a specific-unanimity jury instruction; (2) whether the State was required to prove that Wenthe had knowledge that A.F. sought or received religious or spiritual advice, aid, or comfort at a meeting that also involved sexual penetration; and (3) whether the district court abused its discretion by denying Wenthe's motion to admit evidence of A.F.'s sexual history after it admitted the State's evidence of A.F.'s sexual inexperience.  The court of appeals concluded the district court erred with respect to all three issues and that the cumulative effect of the errors necessitates a new trial.  We reverse.

The facts underlying Wenthe's conviction are set forth in detail in *State v. Wenthe* (*Wenthe II*), 839 N.W.2d 83 (Minn. 2013), and so we only briefly recount them here. Wenthe was a Roman Catholic priest at a parish in Saint Paul.  In the summer of 2003, Wenthe met A.F., who had recently started to attend the church at which Wenthe was a

2

priest. A.F. soon confided in Wenthe about her personal struggles, including suffering sexual abuse as a child and suffering from bulimia. Over the next few months, Wenthe and A.F. developed a mentorship and friendship, spent time together in social contexts, and confided in each other about personal matters. A.F. also asked Wenthe to serve as her "regular confessor" in October 2003 and Wenthe heard A.F.'s confession at least once in that capacity.

On November 12, 2003, Wenthe and A.F. celebrated Wenthe's birthday at A.F.'s apartment. They talked for many hours about topics of religion and sexuality, and Wenthe testified that they also discussed past sexual experiences and sexual acts they would like to perform with each other.

The following evening, November 13, 2003, Wenthe and A.F. met at Wenthe's quarters in the church rectory. A.F. testified that she had a difficult session with her lay therapist earlier in the day, and Wenthe invited her to "call him after" her session if she needed spiritual guidance. Wenthe testified that they had simply agreed to get together that night. Both testified that Wenthe sexually penetrated A.F. for the first time that evening. They met again the following day to discuss what had happened the previous night. A.F. could not remember what they discussed, but she testified that Wenthe sexually penetrated her again. Wenthe denied engaging in sexual conduct that day.

Thereafter, Wenthe and A.F. continued a sexual relationship for approximately 1 year. A.F. testified that she still considered Wenthe to be her priest and viewed the relationship as centered on faith and spirituality. Wenthe testified that the relationship transformed "very quickly" into one based on sexual desire rather than spiritual guidance.

3

The last sexual encounter was in February 2005. Later that year, a friend of A.F. reported the sexual relationship between Wenthe and A.F. to the archdiocese, but A.F. did not report the conduct to the police until 2010, when she learned that Wenthe had been assigned as the parish priest in Delano.

In 2011 the State charged Wenthe with two counts of third-degree criminal sexual conduct under the clergy sexual conduct statute, alleging that Wenthe had sexually penetrated A.F. at a single meeting at which A.F. had sought and received spiritual counsel, Minn. Stat. § 609.344, subd. 1(*l*)(i), and at ongoing meetings at which A.F. had sought and received spiritual counsel, *id.*, subd. 1(*l*)(ii). At trial, the State introduced evidence of sexual penetration during at least two meetings between Wenthe and A.F., either of which could satisfy the single-meeting statute. The district court instructed the jury that their verdict must be unanimous, but the court did not tell the jurors that they must unanimously agree on the meeting at which Wenthe violated the statute.

The district court refused Wenthe's proposed jury instruction that Wenthe must know that he was providing spiritual counsel at a meeting at which he sexually penetrated A.F. The district court also denied Wenthe's pretrial motion to admit evidence of A.F.'s sexual history, stating the evidence was inadmissible under the rape-shield law. *See* Minn. Stat. § 609.347, subd. 3 (2014); Minn. R. Evid. 412. Although the State indicated it would limit sexual-history evidence to the sexual abuse suffered by A.F. as a child, at trial the State introduced evidence that A.F. was sexually inexperienced compared to Wenthe. During the trial Wenthe renewed his motion to admit evidence of A.F.'s sexual history, which was again denied.

The jury acquitted Wenthe of the "ongoing basis" clergy sexual conduct count, but found him guilty of the "single meeting" count. The district court convicted Wenthe of that count and sentenced him to 57 months in prison, stayed execution of the sentence subject to 12 months in the workhouse, and placed Wenthe on probation for 15 years.

The court of appeals reversed the conviction and remanded for a new trial, concluding that the clergy sexual conduct statute, as applied in this case, violated the Establishment Clause of the United States Constitution. *State v. Wenthe* (*Wenthe I*), 822 N.W.2d 822, 829-30 (Minn. App. 2012). The State appealed and we reversed, holding that the clergy sexual conduct statute does not violate the Establishment Clause, either facially or as applied in this case. *Wenthe II*, 839 N.W.2d at 92, 95.

On remand to consider Wenthe's remaining challenges, the court of appeals again reversed and ordered a new trial. *State v. Wenthe* (*Wenthe III*), 845 N.W.2d 222 (Minn. App. 2014). First, the court concluded that the district court violated Wenthe's right to a unanimous verdict by failing to instruct the jury that it must unanimously agree on the specific meeting at which Wenthe violated the single-meeting clergy sexual conduct statute. *Id.* at 228-31. Next, the court held that the jury instructions erroneously omitted a requirement that the State prove Wenthe's knowledge with respect to the "spiritual counsel" element of the statute. *Id.* at 231-33. Finally, the court determined that the district court erred by denying Wenthe's motion to admit evidence of A.F.'s sexual history after it allowed the State to introduce testimony indicating that A.F. was sexually inexperienced. *Id.* at 233-35. The court of appeals concluded that the cumulative effect

5

of the trial errors deprived Wenthe of a fair trial. *Id.* at 235-36. We granted review of all three issues.

## I.

First, the State asserts that the district court did not commit plain error affecting Wenthe's substantial rights by failing to provide a specific-unanimity jury instruction. The State added the single-meeting charge to the complaint the day trial began, alleging that Wenthe sexually penetrated A.F. in a single meeting at which A.F. sought spiritual counsel "[o]n or between the 1st day of November, 2003 and the 31st day of December, 2003." The State introduced evidence of sexual penetration occurring in at least two specific meetings during that timeframe, on November 13 and November 14, 2003, and A.F. testified that she and Wenthe engaged in sexual conduct approximately every two weeks thereafter. The prosecution stated in closing argument that the jury could use any of these meetings to satisfy the single-meeting statute:

> The state . . . has talked about many meetings where [A.F.] talked about receiving religious advice and comfort where there was sexual penetration, but, specifically, there's definitely that very first one [on November 13, 2003], the day she came from that counseling appointment. The time period for this charge is November 1st of 2003 to December 31st of 2003. So if there were any meetings where sexual contact occurred during the course of providing religious aid, comfort and advice, the defendant is guilty.

After closing arguments, the district court instructed the jury: "In order for you to return a verdict, whether guilty or not guilty, each juror must agree with that verdict. In other words, it has to be unanimous." The court of appeals concluded that the district court erred by failing to provide a specific-unanimity instruction. In other words, the district

6

court would have been required to state not only that the jury must unanimously agree that Wenthe violated the clergy sexual conduct statute, but also that the jury must unanimously agree on a specific meeting at which the statute was violated.

Because Wenthe did not request a specific-unanimity instruction or object to the unanimity instruction given, we review for (1) error, (2) that is plain, and (3) that affects Wenthe's substantial rights. *State v. Griller*, 583 N.W.2d 736, 740 (Minn. 1998). If those three prongs are met, we consider whether the error must be addressed to ensure the "fairness, integrity, or public reputation of judicial proceedings." *State v. Crowsbreast*, 629 N.W.2d 433, 437 (Minn. 2001) (citing *Johnson v. United States*, 520 U.S. 461, 467 (1997)).

The State's charging decisions and presentation of evidence are very troubling. The State delayed charging the single-meeting offense until the day of trial and then alleged multiple violations of the single-meeting offense, occurring over the course of 2 months, in a single count. The unanimity problems created by the State's vague drafting of the complaint could have easily been avoided by charging a separate count for each alleged meeting, narrowing the timeframe for the single-meeting count, or electing a specific meeting upon which it would rely to satisfy the single-meeting statute. Accurate charging is especially important here because the single-meeting statute is violated when the clergy member sexually penetrates the complainant "during the course of *a meeting* in which the complainant sought or received religious or spiritual advice, aid, or comfort." Minn. Stat. § 609.344, subd. 1(*l*)(i) (emphasis added). The single-meeting count, as

7

charged by the State, invited ambiguity as to whether the jury was required to identify "a meeting" as provided by the statute.

We need not decide, however, whether the district court erred by omitting a specific-unanimity instruction, because the alleged error did not affect Wenthe's substantial rights. An error affects a defendant's substantial rights "if the error was prejudicial and affected the outcome of the case." *Griller*, 583 N.W.2d at 741. In other words, there must be a " 'reasonable likelihood that the giving of the instruction in question would have had a significant effect on the verdict of the jury.' " *Id.* (quoting *State v. Glidden*, 455 N.W.2d 744, 747 (Minn. 1990)). The defendant bears the "heavy burden" of proving prejudice. *Id.*

The court of appeals concluded that the lack of a specific-unanimity instruction affected Wenthe's substantial rights because "[t]he jury heard contrasting testimony as to the circumstances surrounding the first and later sexual encounters, particularly respecting the facts as to whether or not the complainant sought or received spiritual advice." *Wenthe III*, 845 N.W.2d at 231. The court of appeals' analysis, however, is incomplete. Because the jury determined that Wenthe violated the single-meeting clergy sexual conduct statute, it must have found that at least one specific meeting involved both sexual penetration and spiritual counsel. The parties do not dispute that A.F. sought and received spiritual counsel from Wenthe in the months leading up to the first sexual encounter. The record also establishes only two specific meetings at which sexual penetration may have occurred: Wenthe and A.F. both testified that sexual penetration occurred at the November 13 meeting; A.F. testified that penetration also occurred on

8

November 14; and both testified that sexual conduct continued to occur on later, unidentified dates that may or may not have been during the relevant timeframe. Therefore, the unanimity instruction was prejudicial only if it is reasonably likely that (i) some jurors believed that both sexual penetration and spiritual counsel occurred at the November 13 meeting, but not at subsequent meetings; while (ii) other jurors believed that sexual penetration and spiritual counsel occurred at a later meeting but not at the November 13 meeting. *See Scarborough v. United States*, 522 A.2d 869, 873-74 (D.C. 1987) (concluding that the lack of a specific-unanimity instruction was harmless error).

Jurors could have reasonably concluded that Wenthe violated the single-meeting statute at the November 13 meeting but not at later meetings. Wenthe and A.F. agree that sexual penetration occurred at the November 13 meeting. Additionally, Wenthe claimed that his relationship with A.F. "changed very quickly" into one based on friendship and later sexual desire, suggesting that spiritual counsel was more likely to have been sought or received at the first meeting involving penetration rather than at a later one. Wenthe was acquitted of the ongoing-basis count, so the jury might have found this defense to be credible. The jury therefore could conclude that spiritual counsel and sexual penetration occurred at the first meeting but that the relationship changed afterwards.

There is no reasonable possibility, however, that some jurors concluded that both sexual penetration and spiritual counsel occurred at a later meeting but not at the November 13 meeting. This conclusion requires an assumption that A.F. did not receive spiritual counsel at the November 13 meeting, but then did receive spiritual counsel during a later meeting at which sexual penetration also occurred. A.F.'s testimony does

9

not support this scenario. She provided detailed information regarding the spiritual counsel that she sought or received at the November 13 meeting, but she could not remember what was discussed at the November 14 meeting, and she made only general allegations of spiritual counsel at later meetings. Indeed, the State asserted in closing argument that "definitely that very first [meeting]" involved both sexual penetration and spiritual counsel; no other specific meetings were highlighted. Neither does the scenario comport with Wenthe's theory of the case, as he argued that spiritual counsel ceased before the relationship became sexual in nature. Further, Wenthe and A.F. undisputedly engaged in sexual conduct at the November 13 meeting, but the record is unclear on other dates. Wenthe asserted that no sexual conduct occurred at the second meeting on November 14, and neither Wenthe nor A.F. could remember the exact dates of later sexual encounters. Thus, although the State invited the jury to convict Wenthe "if there were *any meetings* where sexual contact occurred during the course of providing religious aid, comfort, and advice" (emphasis added), it is not reasonably likely that any juror relied on a later meeting but not the November 13 meeting to find Wenthe guilty.

The dissent argues that some jurors could have concluded that Wenthe provided religious or spiritual advice, aid, or comfort on November 14 but not on November 13. The record does not support this assertion. A.F. testified that on November 13, Wenthe invited her to his quarters "as an offering of consolation for the day," and that A.F. "was relieved and excited to see . . . the one person that [she] knew would understand why [her] day had been so difficult." In comparison, the record reveals almost nothing about the November 14 meeting, particularly regarding what A.F. and Wenthe discussed that

10

day. Moreover, A.F. did not identify specific meetings after November 13 when testifying about the spiritual counsel she received from Wenthe. She testified that she and Wenthe fell into "[a] pattern of sexual behavior that was always prompted by an offering of consolation or checking in to see how [she was] doing." She also stated that "[t]he religious piece was the entire context of [their] relationship," that Wenthe "would offer to pray for [her] or express that he would be praying for [her]," and that she "was always seeking spiritual comfort, even in the midst of what became a horrible cycle." Based on this record, it is unlikely that jurors would have distinguished between the spiritual counsel A.F. sought or received at the November 13 and November 14 meetings. If they did, it is not reasonably likely that the November 14 meeting involved spiritual counsel while the November 13 meeting did not.

Because it is not reasonably likely that the district court's failure to provide a specific-unanimity jury instruction significantly affected the verdict, we conclude that any error did not affect Wenthe's substantial rights.

## II.

Next, the State argues that the court of appeals erred when it concluded that the district court abused its discretion by omitting a knowledge requirement from the clergy sexual conduct statute. The court refused to give Wenthe's proffered jury instruction, which included a requirement that the clergy member must have subjective knowledge of

11

the purpose of the meeting at which sexual penetration occurred.[1] Instead, in its instructions to the jury, the court attached a knowledge requirement to only one element in the clergy sexual conduct statute: the intent to sexually penetrate. The court of appeals concluded that the district court's instruction misstated the law because the clergy sexual conduct statute requires "proof of a particularized knowledge" that the complainant sought spiritual counsel. *Wenthe III*, 845 N.W.2d at 232-33.[2] We disagree.

Denial of a requested jury instruction is reviewed for abuse of discretion. *State v. Ndikum*, 815 N.W.2d 816, 818 (Minn. 2012). "Jury instructions are viewed as a whole to determine whether they fairly and adequately explain the law." *State v. Moore*, 699 N.W.2d 733, 736 (Minn. 2005). If review of the instruction requires statutory interpretation, we review the meaning of the statute de novo. *See Ndikum*, 815 N.W.2d at 818.

---

[1] The State contends that this issue should receive plain-error review rather than harmless-error review, because Wenthe's argument on appeal was not "embodied in his objection at trial." *See State v. Kuhnau*, 622 N.W.2d 552, 555 (Minn. 2001). Because we conclude that the district court did not err, we need not determine which standard of review applies.

[2] The court of appeals construed this issue as whether the clergy sexual conduct statute requires general or specific intent. *See Wenthe III*, 845 N.W.2d at 232. A general-intent crime requires only that the defendant "intentionally engag[ed] in the prohibited conduct," whereas a specific-intent crime "requires an 'intent to cause a particular result.'" *State v. Fleck*, 810 N.W.2d 303, 308 (Minn. 2012) (quoting 9 Henry W. McCarr & Jack S. Nordby, *Minnesota Practice—Criminal Law and Procedure* § 44:3, at 515 (4th ed. 2012)). Because the clergy sexual conduct statute does not require the clergy member to intend a particular result, the statute is a general-intent crime regardless of whether the clergy member must have knowledge that the complainant sought or received spiritual counsel.

"Mens rea is the element of a crime that requires 'the defendant know the facts that make his conduct illegal.' " *Id.* (quoting *Staples v. United States*, 511 U.S. 600, 605 (1994)). Generally, criminal sexual conduct offenses require only an intent to sexually penetrate, unless additional mens rea requirements are expressly provided. *See State v. Bookwalter*, 541 N.W.2d 290, 296 (Minn. 1995) (citing *State v. Lindahl*, 309 N.W.2d 763, 766-67 (Minn. 1981)). But this does not end our analysis. *See In re Welfare of C.R.M.*, 611 N.W.2d 802, 808 (Minn. 2000) (noting the "long established principle of American criminal jurisprudence" that mens rea is required for common-law and felony crimes).

We are particularly hesitant to dispense with mens rea when doing so would result in a strict liability offense. *Id.* at 805. In *C.R.M.*, we concluded that a person who carries a knife on school property is not guilty of felony possession of a dangerous weapon on school property unless he knows he possesses the knife. *Id.* at 810. We noted that although on its face the statute contained no mens rea requirement, "the legislature never explicitly indicated that it intended to create a strict liability offense." *Id.* at 808; *see also Staples*, 511 U.S. at 620 ("[I]f Congress had intended to make outlaws of gun owners who were wholly ignorant of the offending characteristics of their weapons, . . . it would have spoken more clearly to that effect."). We came to a similar conclusion in *State v. Ndikum*, 815 N.W.2d at 822 (requiring the State to prove that the defendant knew he possessed a pistol to be guilty of the crime of possession of a pistol in public), and *State v. Al-Naseer*, 734 N.W.2d 679, 685-86 (Minn. 2007) (concluding that for purposes of criminal vehicular homicide for leaving the scene, a defendant must know he was in an

accident with a person or vehicle because "failure to stop is not a crime in all circumstances"). The statutes at issue in *C.R.M.*, *Ndikum*, and *Al-Naseer* would have imposed strict liability but for the implied knowledge requirement.

By contrast, we have generally declined to imply mens rea when the statute does not otherwise result in strict liability. In *State v. Benniefield*, 678 N.W.2d 42, 44 (Minn. 2004), we concluded that the crime of possession of a controlled substance in a school zone does not require the State to prove the defendant knew he was in a school zone. The offense does not impose strict liability because the state must prove knowledge of drug possession, *see State v. Florine*, 303 Minn. 103, 104, 226 N.W.2d 609, 610 (1975), and we declined to add an additional mens rea requirement for knowledge of the location where the possession occurred. *Benniefield*, 678 N.W.2d at 49. We recently reaffirmed this holding in *State v. Garcia-Gutierrez*, 844 N.W.2d 519, 523-25 (Minn. 2014), concluding that the crime of burglary with a dangerous weapon is not a strict liability offense and does not require knowledge of gun possession because the underlying offense—burglary—already carries a mens rea requirement.

With this in mind, we turn to the language of the clergy sexual conduct statute:

A person who engages in sexual penetration with another person is guilty of criminal sexual conduct in the third degree if any of the following circumstances exists:
. . . .
    (*l*) the actor is or purports to be a member of the clergy, the complainant is not married to the actor, and:
    (i) the sexual penetration occurred during the course of a meeting in which the complainant sought or received religious or spiritual advice, aid, or comfort from the actor in private; or
    (ii) the sexual penetration occurred during a period of time in which the complainant was meeting on an ongoing basis with the actor to seek or

14

> receive religious or spiritual advice, aid, or comfort in private.  Consent by
> the complainant is not a defense . . . .

Minn. Stat. § 609.344, subd. 1(*l*) (2014).  On its face, the "spiritual counsel" element of the clergy sexual conduct statute carries no knowledge requirement.  Moreover, the structure of the statute does not suggest a mens rea requirement for the "spiritual counsel" element.  *See Morton Bldgs., Inc. v. Comm'r of Revenue*, 488 N.W.2d 254, 259 (Minn. 1992) (considering a statute's structure as part of statutory interpretation).  Minnesota Statutes § 609.344, subd. 1 (2014), provides that "[a] person who engages in sexual penetration . . . is guilty . . . *if any of the following circumstances exist*" (emphasis added), and then provides the necessary circumstances, which include a meeting involving spiritual counsel.  As in *Garcia-Gutierrez*, this structure suggests that mens rea attaches to the act described in the primary clause ("sexual penetration") and not to the "attendant circumstances" described later in the statute.  *See Garcia-Gutierrez*, 844 N.W.2d at 523 (concluding that mens rea applied to the primary clause in the definition of first-degree burglary, Minn. Stat. § 609.582, subd. 1 (2014), and not to the additional "circumstances" described in the secondary clause, subdivision 1(b), where the secondary clause was silent as to mens rea).

Furthermore, the clergy sexual conduct statute is not a strict liability offense because we have stated that sexual penetration must be intentional.  *Bookwalter*, 541 N.W.2d at 296; *see State v. Evans*, 756 N.W.2d 854, 875 (Minn. 2008) (concluding that first-degree peace-officer murder is not a strict liability offense because " '[l]ack of knowledge of a peace officer's identity does not change the fact that intent to kill must be

15

shown' " (quoting *State v. Angulo*, 471 N.W.2d 570, 573 (Minn. App. 1991))). Wenthe argues that an additional mens rea element is required because sexual penetration is not inherently criminal. But the clergy sexual conduct statute is similar to the statute at issue in *Ndikum*. In that case, we considered whether, and what type, of mens rea is required to commit the crime of possession of a pistol in public, Minn. Stat. § 624.714, subd. 1a (2014). We concluded that the statute merely requires knowledge of possession of a pistol, which also is not inherently criminal conduct. *Ndikum*, 815 N.W.2d at 821. We did not require knowledge of *location* in that case, even though possession of a pistol without a permit is a crime only in a public place.

In *Benniefield* and *Garcia-Gutierrez*, by contrast, the defendants sought a mens rea requirement for the *circumstances* that enhanced the crime. We concluded that because a mens rea requirement already existed for the underlying offenses—drug possession and burglary—the additional circumstances did not warrant an additional knowledge requirement. Based on these cases, including *Ndikum*, the mere fact that sexual penetration is not inherently criminal does not necessitate an additional knowledge requirement for the circumstances attendant to the penetration.

The court of appeals concluded that a mens rea requirement for the "spiritual counsel" element would harmonize the clergy sexual conduct statute with other criminal sexual conduct offenses. *Wenthe III*, 845 N.W.2d at 232. The court asserted that because several criminal sexual conduct offenses include an additional mens rea element, the clergy sexual conduct statute should be construed in the same way. *Id.*; *see* Minn. Stat. § 609.341, subd. 11(a) (2014) (stating that offenses involving "sexual contact" must be

16

"committed with sexual or aggressive intent"); Minn. Stat. § 609.344, subd. 1(d) (criminalizing sexual penetration when "the actor knows or has reason to know that the complainant is mentally impaired, mentally incapacitated, or physically helpless"). But these statutes merely demonstrate that the Legislature knows how to add an *explicit* mens rea requirement. In fact, these provisions caution us against adding an *implicit* requirement in others, because the Legislature could, and has, included a mens rea term when one was intended. *See Evans*, 756 N.W.2d at 875-76 (declining to interpret Minnesota's peace-officer murder statute to require knowledge that the victim was an officer because the statute "is worded differently than statutes in many other jurisdictions" that include an explicit knowledge requirement).

The court of appeals also concluded that a knowledge requirement would harmonize the clergy sexual conduct statute with "other provisions in section 609.344, which do not presume a vulnerable victim but require proof of the pre-existence of a mental or emotional condition or that the actor uses deceptive conduct." *Wenthe III*, 845 N.W.2d at 233 (citing *State v. Bussmann*, 741 N.W.2d 79, 88 (Minn. 2007) (Hanson, J.) (plurality opinion)). For example, the psychotherapist sexual conduct statute requires an "ongoing psychotherapist-patient relationship," Minn. Stat. § 609.344, subd. 1(h)(ii), an "emotional dependen[ce] upon the psychotherapist," *id.*, subd. 1(i), or "therapeutic deception," *id.*, subd. 1(j). *See also Wenthe III*, 845 N.W.2d at 233 (noting that the clergy evidentiary privilege statute, Minn. Stat. § 595.02, subd. 1(c) (2014), prohibits a member of the clergy from testifying about a confession made to the clergy member in his or her "professional character"). However, "courts cannot supply that which the legislature

17

purposely omits or inadvertently overlooks." *Wallace v. Comm'r of Taxation*, 289 Minn. 220, 230, 184 N.W.2d 588, 594 (1971). The scope of the psychotherapist-sexual-conduct and clergy-privilege statutes is expressly limited by language that is absent in the clergy sexual conduct statute. It is inappropriate to assume that the Legislature intended the scope of the clergy sexual conduct statute to be coextensive with other statutes that contain different language. Further, the court of appeals overlooks other criminal sexual conduct statutes that, like the clergy sexual conduct statute, "presume a vulnerable victim." *See, e.g.*, Minn. Stat. § 609.344, subd. 1(a)-(b), (d) (statutory rape); *id.*, subd. 1(m) (employee of secure treatment or correctional facility).

The dissent notes that a clergy member engaging in a nonmarital sexual relationship may lack notice of the potential criminality of his or her actions. We agree that notice may be lacking if, for example, the complainant does not frequent the clergy member's place of worship, the complainant lies about the purpose of their meetings, or the communication between complainant and clergy member is limited to a vague theological discussion without something more. But this is not that case: regardless of Wenthe's subjective belief at the time of the sexual encounters, he certainly had notice that his actions were potentially criminal. Further, even without an additional knowledge requirement, clergy members are protected from inadvertent violations of the statute because the State must still prove that the complainant actually sought or received spiritual counsel. Here, the evidence indicating that A.F. sought spiritual counsel is more than sufficient, as A.F. worshipped at Wenthe's church and met him at a church event, Wenthe had served as A.F.'s regular confessor in the past, at least initially their

relationship and discussions centered around religion and spirituality, and the initial penetration occurred on church property. To the extent the dissent believes that the language of the statute is insufficiently vague as currently drafted to provide notice, that problem is properly solved by the Legislature rather than by implying an additional mens rea requirement.

We conclude that the clergy sexual conduct statute does not require the clergy member to know that the complainant seeks or is receiving spiritual counsel. The district court therefore did not err by refusing to give Wenthe's proposed jury instruction.

III.

Finally, the State challenges the court of appeals' conclusion that the district court violated Wenthe's due process right to present a complete defense. Before trial, the district court denied Wenthe's motion to admit evidence regarding A.F.'s sexual history based on the rape-shield law. *See* Minn. Stat. § 609.347, subd. 3 (2014); Minn. R. Evid. 412. The State indicated it would introduce only relevant sexual-history evidence related to A.F.'s sexual abuse as a child. During A.F.'s direct examination, however, the district court allowed the prosecutor to elicit the following testimony:

> Q. In addition to you performing oral sex or fellatio on him, and the anal sex, was there any other kind of penetration? In that sense I mean did he—did he ever perform oral sex on you?
>
> A. Yes, eventually, again, not initially, but eventually he did. I—I'd never done anything like that before, and I trusted him.
>
> . . . .
>
> Q. Apart from being raped as a child, were you a virgin at that time?

19

A. Yes.

Q. Did the defendant try to convince you to have intercourse with him?

A. No.

Q. Did you let him know that you didn't want to have intercourse?

A. Yes.

. . . .

Q. Was there any discussion at all about why—having anal sex as opposed to vaginal sex?

A. I think—I don't—I don't recall. I don't recall that. I just—I mean anal sex—you know, you wouldn't get pregnant. And, I mean, that was a fear of his, of course. And it was important to me in some strange way to protect my virginity.

During closing argument, the prosecutor also described A.F. as "naive, vulnerable, [and] inexperienced."

> After A.F.'s direct testimony, Wenthe's counsel made the following offer of proof:
>
> [F]or the record, had I been allowed to do so, I would have asked [Wenthe] what conversation he did have with [A.F.] on the evening of November 12, which was the long five-hour conversation that they had. He would have testified that she told him that with past boyfriends that she enjoyed oral sex, that anal sex was something that she had experienced, that given her experience and her past that she would enjoy doing the same with him, and that conversation that she had with him formulated his intentions the next day and his intentions as the relationship progressed.

The district court did not amend its earlier ruling.

Evidentiary rulings are reviewed for an abuse of discretion, even when a constitutional violation is alleged. *State v. Profit*, 591 N.W.2d 451, 463 (Minn. 1999); *see State v. Richards*, 495 N.W.2d 187, 195 (Minn. 1992) ("[T]he accused 'must comply

20

with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.' " (quoting *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973))). A violation of a criminal defendant's constitutional rights necessitates a new trial unless the violation was harmless beyond a reasonable doubt. *State v. Jones*, 556 N.W.2d 903, 910 (Minn. 1996).

In a prosecution for criminal sexual conduct, "evidence of the victim's previous sexual conduct shall not be admitted nor shall any reference to such conduct be made in the presence of the jury," unless one of the enumerated exceptions applies and "the probative value of the evidence is not substantially outweighed by its inflammatory or prejudicial nature." Minn. Stat. § 609.347, subd. 3; Minn. R. Evid. 412; *see State v. Friend*, 493 N.W.2d 540, 545 (Minn. 1992) (noting that the rape-shield law limits admission of evidence of the complainant's prior sexual conduct). The rape-shield law "serves to emphasize the general irrelevance of a victim's sexual history, not to remove relevant evidence from the jury's consideration." *State v. Crims*, 540 N.W.2d 860, 867 (Minn. App. 1995) (citing *State v. Elijah*, 206 Minn. 619, 621, 626, 289 N.W. 575, 577, 579 (1940)), *rev. denied* (Minn. Jan. 23, 1996). We have construed the rape-shield law as allowing sexual-history evidence, however, when "admission is constitutionally required by the defendant's right to due process, his right to confront his accusers, or his right to offer evidence in his own defense." *State v. Benedict*, 397 N.W.2d 337, 341 (Minn. 1986) (citing *State v. Caswell*, 320 N.W.2d 417, 419 (Minn. 1982)).

The court of appeals concluded that the State's evidence of A.F.'s sexual inexperience "opened the door" to Wenthe's rebuttal evidence of her past sexual conduct,

21

and the district court's refusal to admit this evidence was an abuse of discretion. *Wenthe III*, 845 N.W.2d at 234-35. " 'Opening the door' occurs when 'one party by introducing certain material . . . creates in the opponent a right to respond with material that would otherwise have been inadmissible.' " *State v. Valtierra*, 718 N.W.2d 425, 436 (Minn. 2006) (alteration in original) (quoting 8 Henry W. McCarr & Jack S. Nordby, *Minnesota Practice—Criminal Law and Procedure* § 32:90, at 691 (4th ed. 2012)). This doctrine is " 'essentially one of fairness and common sense,' " and prevents one party from gaining an unfair advantage. *Id.* (quoting 8 McCarr & Nordby, *supra*, § 32.90, at 691-92).

The State should not have introduced evidence indicating that A.F. was sexually inexperienced and abstained from vaginal intercourse to "protect [her] virginity," and the district court abused its discretion by allowing it to do so. The rape-shield law applies equally to evidence offered by the prosecution and the defense. Minn. Stat. § 609.347, subd. 3 ("[E]vidence of the victim's previous sexual conduct shall not be admitted . . . ."); *see, e.g.*, *State v. Calbero*, 785 P.2d 157, 161-62 (Haw. 1989); *People v. Sandoval*, 552 N.E.2d 726, 730-31 (Ill. 1990); *State v. Gavigan*, 330 N.W.2d 571, 576 (Wis. 1983). It also applies to "negative" evidence—i.e., an assertion that the complainant does *not* have prior sexual experience. *See Gavigan*, 330 N.W.2d at 576 ("Nothing in the [Wisconsin rape-shield] statute limits its applicability to prior affirmative acts. Rather, the plain meaning of the words 'prior sexual conduct' includes the lack of sexual activity as well."). The State's irrelevant characterization of A.F.'s sexual history is particularly troubling because of the prosecution's commitment in pretrial discussions to limit sexual-history evidence to A.F.'s sexual abuse as a child. The State offers no explanation for its

22

about-face and, also inexplicably, the district court was silent in response to the State's decision to abandon its commitment to the court.

But the conduct of the State here, and the failure of the district court to respond, does not establish that the court abused its discretion by declining to admit Wenthe's proffered evidence. The limited relevance and probative value of that evidence does not substantially outweigh its prejudicial and harmful effect. *See* Minn. R. Evid. 403, 412. Wenthe argues that the evidence demonstrates that A.F. was more likely to view the relationship as based on sexual desire rather than religious mentorship. But the evidence at issue merely shows that A.F. had previous sexual partners. It provides little insight into her specific relationship with Wenthe, and offers few clues as to whether she was less likely to have sought spiritual advice while engaging in sexual conduct with him. There is no indication, for example, that the proffered evidence demonstrates that A.F. had prior sexual experiences with other clergy members or counselors. If anything, the evidence is merely probative on the question of whether A.F. consented to the sexual penetration, which is irrelevant here because "[c]onsent by the complainant is not a defense" to clergy sexual conduct. Minn. Stat. § 609.344, subd. 1(*l*).

The court of appeals asserted that Wenthe's proffered sexual-history evidence would have provided a "source of sexual knowledge independent of [A.F.'s] experiences" with Wenthe. *Wenthe III*, 845 N.W.2d at 235. But a complainant's source of knowledge ordinarily becomes relevant only when the defendant asserts that the complainant fabricated the sexual conduct. *See* Harriett R. Galvin, *Shielding Rape Victims in the State and Federal Courts: A Proposal for the Second Decade*, 70 Minn. L.

Rev. 763, 865-67 (1986). There, sexual-history evidence "establish[es] a source of knowledge or familiarity with sexual matters in circumstances in which lack of knowledge is the likely inference to be drawn by the fact finder." *Id.* at 866; *see, e.g.*, *State v. Kroshus*, 447 N.W.2d 203, 205 (Minn. App. 1989) (developmentally disabled complainant), *rev. denied* (Minn. Dec. 20, 1989); *Summitt v. State*, 697 P.2d 1374, 1377 (Nev. 1985) (6-year-old complainant); *State v. Howard*, 426 A.2d 457, 462 (N.H. 1981) (12-year-old complainant). Here, Wenthe conceded that sexual penetration occurred, so source-of-knowledge evidence is unnecessary. Moreover, A.F.'s general source of knowledge of sexual matters is largely irrelevant to the primary disputed question of whether she sought or received spiritual counsel.

But even assuming the district court abused its discretion in disallowing Wenthe's sexual-history evidence, any error was harmless beyond a reasonable doubt. Constitutional error does not result in a reversal of a conviction "if the verdict actually rendered was surely unattributable to the error." *Jones*, 556 N.W.2d at 910 (citing *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993)). Although the State elicited testimony from A.F. that she was sexually inexperienced and made a statement to that effect during closing argument, A.F. also significantly undercut the State's suggestion that she was "inexperienced" when she testified about her tendency to "dissociate" during previous sexual experiences with other partners. Moreover, Wenthe testified that he and A.F. had discussed "the type of sexual behavior that might interest one another" and "past sexual practices that [they] had respectively engaged in," and Wenthe's counsel vigorously cross-examined A.F. regarding Wenthe and A.F.'s conversations about sexual matters.

24

Most importantly, Wenthe was allowed to—and did—testify at length about his perception of his relationship with A.F. He believed that their relationship "changed very quickly" into one based on sexual desire rather than spiritual guidance. The jury evidently rejected Wenthe's version of the facts, and Wenthe provides no reason to conclude that the verdict would have been different if the jury knew more about A.F.'s past sexual experiences. Based on this record, the verdict was surely unattributable to the error, if any. We therefore conclude that the district court's decision to deny Wenthe's motion to admit evidence of A.F.'s sexual history was not an abuse of discretion and was harmless beyond a reasonable doubt.

Because we conclude that the challenged decisions of the district court were either not error, did not affect Wenthe's substantial rights, or were harmless beyond a reasonable doubt, we reverse the court of appeals and reinstate Wenthe's conviction.

Reversed.

DIETZEN, J., took no part in the consideration or decision of this case.

WRIGHT, J., took no part in the consideration or decision of this case.

PAGE, Justice (dissenting).

I respectfully dissent. I disagree with the court that the trial court's errors with respect to the jury-unanimity instruction and sexual-history evidence were harmless. But I am particularly troubled by the court's conclusion that a clergy member need not know the purpose of the meeting at which sexual penetration occurs to be found guilty of clergy sexual conduct.

I.

I begin with the issue of mens rea in the clergy sexual conduct statute, Minn. Stat. § 609.344, subd. 1(*l*) (2014), which prohibits sexual penetration when

> the actor is or purports to be a member of the clergy, . . . and:
>
> (i) the sexual penetration occurred during the course of a meeting in which the complainant sought or received religious or spiritual advice, aid, or comfort from the actor in private; or
>
> (ii) the sexual penetration occurred during a period of time in which the complainant was meeting on an ongoing basis with the actor to seek or receive religious or spiritual advice, aid, or comfort in private. Consent by the complainant is not a defense . . . .

The court's analysis hinges solely on whether the statute would impose strict liability without an implied requirement that the clergy member must know he or she is providing spiritual counsel. Because the statute already requires knowledge of sexual penetration, the court concludes that an additional knowledge requirement for provision of spiritual counsel is unnecessary. But even if it is assumed that the statute does not impose strict

liability, the court's simplistic analysis incorrectly assumes that an additional knowledge requirement is unnecessary whenever a statute does not on its face impose strict liability.

"Mens rea is the element of a crime that requires 'the defendant know the facts that make his conduct illegal.' " *State v. Ndikum*, 815 N.W.2d 816, 818 (Minn. 2012) (quoting *Staples v. United States*, 511 U.S. 600, 605 (1994)). *In re Welfare of C.R.M.*, 611 N.W.2d 802 (Minn. 2000), presented us with the question of whether to imply a knowledge requirement for the offense of felony possession of a dangerous weapon on school property, which on its face imposed strict liability.[1] We noted that knives are generally innocuous tools that "can be used for a myriad of completely benign purposes." *Id.* at 810. In contrast to possession of illegal narcotics or hand grenades, which are "inherently anti-social," mere possession of a knife "does not put owners on notice that they are engaging in conduct inherently dangerous to the public." *Id.* at 806, 810. We therefore required the State to prove that the defendant "knew he possessed the knife on school property" because failure to do so would "criminalize[] a broad range of what would otherwise be innocent conduct." *Id.* at 809-10; *see also Ndikum*, 815 N.W.2d at 822 (requiring knowledge of possession for the offense of possession of a pistol in public).

In *State v. Benniefield* we came to the opposite conclusion, holding that the crime of possession of narcotics in a school zone does not require that the defendant know he is

---

[1] In 2003, the Legislature amended the statute to include a knowledge requirement consistent with our opinion in *C.R.M.* *See State v. Benniefield*, 678 N.W.2d 42, 48 n.3 (Minn. 2004).

in a school zone. 678 N.W.2d 42, 49 (Minn. 2004). We stated that, unlike possession of a knife, possession of illegal narcotics in and of itself is " 'inherently anti-social' " such that "the possessor is already on notice of the illegality of his actions, without regard to location." *Id.* at 48 (quoting *C.R.M.*, 611 N.W.2d at 810). By possessing illegal narcotics, the defendant "assume[d] the risk that he might enter a location that will make the consequences of his crime more severe." *Id.* Similarly, we have held that a defendant may be convicted of first-degree burglary with a dangerous weapon without knowing he possessed the weapon because "mens rea is already required for the underlying crime—burglary; possession of a weapon merely enhances the severity of the offense." *State v. Garcia-Gutierrez*, 844 N.W.2d 519, 525 (Minn. 2014).

The common thread of all these cases is that a person must know the facts that make his or her conduct illegal; in other words, he or she must be "on notice" that particular conduct may be criminal. In some cases, when a person's conduct is inherently dangerous or threatens the public welfare, no knowledge requirement is needed, and strict liability may be enforced. The possessor of an unlicensed hand grenade, for example, is on notice of a crime because "one would hardly be surprised to learn that the possession of hand grenades is not an innocent act." *Ndikum*, 815 N.W.2d at 820 (quoting *United States v. Freed*, 401 U.S. 601, 609 (1971)). Similarly, when the underlying behavior is already criminal in nature, such as possession of illegal narcotics or possession of a dangerous weapon during a burglary, the actor is already "on notice" that he or she is committing a crime, so mens rea is not required for an *additional* element that subjects a person to liability for a more serious crime. *See Garcia-Gutierrez*, 844 N.W.2d at 525;

D-3

*Benniefield*, 678 N.W.2d at 48. But the same cannot be said in cases in which the underlying conduct is not criminal. "[M]ere possession" of a knife or a firearm does not provide notice of a possible crime, so an additional mens rea is required. *See C.R.M.*, 611 N.W.2d at 806; *Ndikum*, 815 N.W.2d at 822.

Thus, even if the clergy sexual conduct statute does not impose strict liability, that is not the end of our analysis, as the court appears to believe. Instead, we must determine whether an additional mens rea is necessary to put a member of the clergy on notice that his or her conduct may be criminal. The court asserts that because we require knowledge of sexual penetration, an additional knowledge requirement is unnecessary. But sexual penetration between consenting adults is ordinarily innocuous behavior—even constitutionally protected behavior in most cases. *See Lawrence v. Texas*, 539 U.S. 558, 578 (2003). Indeed, the court does not contend that sexual conduct involving members of the clergy is inherently dangerous, nor that it is by itself a criminal act. Mere knowledge of sexual penetration therefore does not put a clergy member "on notice" that his or her actions may be criminal. Like possession of a knife, which is not criminal until it occurs within a school zone, sexual penetration by a member of the clergy is not criminal *unless and until* it coincides with a meeting at which spiritual counsel is sought or received.

The clergy sexual conduct statute is wholly different from the statutes at issue in *Benniefield* and *Garcia-Gutierrez*. In those cases, the defendant was already on notice that his underlying conduct was criminal, and we refused to imply a mens rea requirement with respect to the additional element that enhanced the sentence. Here, providing spiritual counsel does not "merely enhance[] the severity of the offense." *See*

D-4

*Garcia-Gutierrez*, 844 N.W.2d at 525. Rather, providing spiritual counsel *is the act that makes the conduct criminal*. Without spiritual counsel, there is no crime. The State must therefore prove that the clergy member knew, or at least had reason to know, that spiritual counsel was being sought.

The court's analysis is especially troubling because the clergy sexual conduct statute is markedly different from most other statutory rape offenses. First, statutory rape offenses generally protect a discrete class of people with a particular vulnerability, such as age or disability. *See, e.g.*, Minn. Stat. § 609.342, subd. 1(a) (2014) (protecting complainants under 13 years of age who are more than 3 years younger than the actor). The clergy sexual conduct statute has no such limiting characteristic. Although the statute was enacted to prevent clergy from taking advantage of their parishioners, any person can assert a violation of the clergy sexual conduct statute. And because a clergy member need not know that he or she is providing spiritual counsel under the court's interpretation, a violation of the statute could arise from *any* nonmarital sexual conduct with *any* person, even though most such relationships would be consensual and otherwise lawful. The statute effectively bars clergy members from engaging in nonmarital sexual conduct and "criminalizes a broad range of what would otherwise be innocent conduct." *C.R.M.*, 611 N.W.2d at 809-10. In addition, the court's holding today exacerbates the constitutional deficiencies of the clergy sexual conduct statute. *See State v. Wenthe*, 839 N.W.2d 83, 96 (Minn. 2013) (Page, J., dissenting).

Moreover, most types of statutory rape are based on characteristics that are readily apparent, such as the complainant's age or a special relationship between the actor and

complainant. The only unifying characteristic under the clergy sexual conduct statute is that the complainant seeks or receives spiritual counsel. This trait is wholly subjective and may be impossible for the clergy member to ascertain. The court suggests that a more focused definition from the Legislature of "religious or spiritual advice, aid, or comfort" would alleviate this concern. Of course, that will not help those clergy, like Wenthe, who are subject to the statute as it reads today. Moreover, even if the Legislature were inclined to clarify the statutory language, clarified language by itself will not necessarily address the real issue here: because a violation of the statute may turn on the complainant's subjective interest, clergy members will lack notice that their actions may be criminal. A knowledge requirement, by contrast, would subject clergy members to criminal penalties only if they knew or had reason to know that a particular sexual relationship may pose a risk of violating the statute.

As a consequence, the court's interpretation of the clergy sexual conduct statute may result in a guilty verdict based entirely on what the complainant thought. By contrast, the elements of other statutory rape offenses are proven by more objective standards. *See, e.g.*, Minn. Stat. § 609.344, subd. 1(a)-(b), (e) (complainant's age); *id.*, subd. 1(d) (complainant is mentally impaired); *id.*, subd. 1(f)-(g) (actor and complainant have a "significant relationship"); *id.*, subd. 1(h)-(j) (actor is a psychotherapist and complainant is a patient or former patient). I can think of no other criminal offense in which the complainant's subjective beliefs, without more, can provide proof of a crime beyond a reasonable doubt. A.F.'s understanding of the relationship is, of course, relevant—but so is Wenthe's. Under the court's interpretation of the clergy sexual

D-6

conduct statute, the clergy member's subjective belief regarding the provision of spiritual counsel is ignored, whereas the complainant's subjective belief that such counsel was sought or received may constitute the *sole* evidence to support a conviction. This outcome is contrary to our case law and ignores the very purpose of mens rea, which ensures that an actor "know[s] the facts that make his conduct illegal." *See Ndikum*, 815 N.W.2d at 818 (quoting *Staples*, 511 U.S. at 606). A requirement that the clergy member know, or have reason to know, that spiritual counsel is sought will ensure that both the complainant's and clergy member's states of mind are considered.

Finally, the court acknowledges that, without an additional knowledge requirement, a clergy member may sometimes lack notice of the potential criminality of his or her actions. This possibility, which sounds like a classic case of strict liability, does not bother the court because, in its view, regardless of what Wenthe believed, the evidence is "more than sufficient" that Wenthe provided spiritual counsel to A.F. and had notice that his actions may be criminal. But the court's concern that there is a notice problem with the statute demonstrates that knowledge of spiritual counsel is necessarily a part of the clergy sexual conduct statute, regardless of whether, in this particular case, other facts support Wenthe's guilt. The court also ignores the fact that a felony statute lacking an adequate mens rea requirement may violate the Due Process Clause, regardless of the specific circumstances at issue. *See, e.g.*, *State v. Guminga*, 395 N.W.2d 344, 346 (Minn. 1986) (declaring unconstitutional a statute that subjected a defendant to imprisonment when the defendant's employee sold liquor to a minor without the defendant's knowledge).

Moreover, in downplaying the notice requirement in this case, the court relies on facts that may illuminate Wenthe and A.F.'s *past* relationship, but that tell us little, if anything, about the purpose of any of the meetings at which sexual penetration occurred and for which Wenthe may have been convicted. Wenthe testified that the relationship "changed very quickly" before the first sexual encounter; evidently, the jury was receptive to this defense, as Wenthe was acquitted of the ongoing-basis count. At bottom, the court's interpretation of Minn. Stat. § 609.344, subd. 1(*l*), encourages juries to consider past behaviors rather than the evidence most germane to the spiritual-counsel element: the defendant's subjective belief as to whether spiritual counsel was sought at the meeting at which the sexual penetration occurred. I would therefore affirm the court of appeals on this issue and remand for a new trial.

## II.

I also dissent from the court's conclusions with respect to the trial court's failure to give a unanimity jury instruction and the exclusion of evidence relating to A.F.'s sexual inexperience.

## A.

First, I disagree with the court's conclusion that the failure to provide a specific-unanimity jury instruction did not affect Wenthe's substantial rights. The court does not decide whether the trial court committed plain error by not giving the instruction.[2]

---

[2] Given the 2-month timeframe for the single-meeting count, and the specific language of the clergy sexual conduct statute, which requires that the offense must occur during "a meeting," I would conclude that the trial court committed plain error.

Instead, the court affirms the conviction because "it is not reasonably likely that the district court's failure to provide a specific-unanimity jury instruction significantly affected the verdict." In doing so, the court notes that a specific-unanimity instruction would have informed the jury that it must agree on the specific meeting at which Wenthe violated the clergy sexual abuse statute. Therefore, the court reasons that the failure to provide the instruction significantly affected the verdict only if it is reasonably likely that the jury did not agree on a specific meeting at which Wenthe sexually penetrated A.F. and provided spiritual counsel. The court reasons that the alleged error was harmless because the evidence admitted at trial overwhelmingly related to the first meeting on November 13, 2003, leaving no reasonable possibility that some jurors could have believed Wenthe violated the statute at a later meeting but not on November 13.[3]

But that reasoning merely begs the question. Just because the jurors unanimously agreed that Wenthe violated the statute does not necessarily mean that the jurors unanimously agreed on the element of the offense that requires that "the sexual penetration occurred during the course of *a meeting* in which [A.F.] sought or received religious or spiritual advice, aid, or comfort from [Wenthe]." Minn. Stat. § 609.344, subd. 1(*l*)(i) (emphasis added). According to the criminal complaint, the timeframe during which this element could have been met spanned from November 1 to December

---

[3]    In support of this theory, the court appears to argue that all of the testimony centers around the November 13 meeting, but the court later argues that the November 13 meeting is indistinguishable from the November 14 meeting and future meetings. These inconsistent theories in fact support my contention that we cannot say with any reasonable accuracy what the jury relied on to reach its decision.

31, 2003, yet the record before us is not at all clear as to the specific meeting or meetings at which Wenthe and A.F. engaged in sexual contact and at which A.F. sought or received religious or spiritual advice, aid, or comfort. Given this record, and the fact that the jury instructions merely stated that the offense had to have occurred during "a meeting" and that the verdict "had to be unanimous," but did not say that the jurors had to unanimously agree on the date that the meeting occurred, it is possible, and perhaps likely, that the jurors unanimously agreed that Wenthe had violated the statute at a single meeting without having unanimously agreed on the specific meeting at which the violation occurred. For example, it is possible, given the less-than-clear record before them, that some jurors may have determined that Wenthe and A.F. engaged in sexual activity and that A.F. sought or received spiritual advice, aid, or comfort at the November 13 meeting but not on November 14, while others may have determined the opposite, that Wenthe and A.F. engaged in sexual activity and A.F. sought religious or spiritual advice, aid, or comfort at the meeting on November 14 but not on November 13.[4]

Compounding the trial court's failure to give a unanimity instruction is the State's invitation to the jury to disregard the single-meeting element of the offense, stating in closing argument that Wenthe was guilty if *any meeting* involved both sexual penetration

---

[4]     There is evidence to suggest that A.F. sought or received advice, aid, or comfort from Wenthe on both November 13 and November 14. It is entirely unclear from the record, however, whether the advice, aid, or comfort sought was religious or spiritual in nature. Given that the jury acquitted Wenthe of some of the charges against him, it is fair to say that the jury believed and disbelieved parts of Wenthe's and A.F.'s testimony. On that basis, and given the lack of clarity in the record, it is not possible to say with any certainty that the jurors unanimously agreed on the specific meeting at which all of the elements of the offense were met.

and spiritual counsel. Applying the State's closing argument, the jury's members could easily have decided that Wenthe violated the statute without seriously considering the precise date on which the violation occurred, or they could have ignored the single-meeting element and relied on different dates to reach a "unanimous" result.

Reversal is also necessary to ensure the fairness, integrity, and public reputation of the judicial proceedings. *See State v. Griller*, 583 N.W.2d 736, 740, 742 (Minn. 1998). Not only did the trial court's instruction misstate the law, but the court allowed the State to add further confusion by implying that the date of the single meeting was irrelevant. Given the uncertainty surrounding the knowledge requirement for the spiritual-counsel element, the jury lacked sufficient direction in its evaluation of the two genuine issues in this trial: did Wenthe provide spiritual counsel on or after November 13, 2003, and did that counseling occur at a meeting that involved sexual penetration? These errors, especially when considered in combination with the trial court's exclusion of sexual-history evidence (discussed below), call into considerable question the fairness, integrity, and public reputation of the judicial proceedings.

B.

I would also conclude that the trial court denied Wenthe his right to a fair trial when it refused to admit his proffered sexual-history evidence. I agree with the court that the State should not have offered evidence of A.F.'s sexual inexperience, and the State's reference to A.F. as "naive, vulnerable, [and] inexperienced" in closing arguments was particularly inexcusable. The court's admission of the State's evidence violated the rape-shield law because it was irrelevant, it was prejudicial to Wenthe, and it gave the jury a

D-11

false impression of A.F.'s sexual history. The court concludes, however, that Wenthe's evidence of A.F.'s sexual experience was equally irrelevant and prejudicial, and therefore that Wenthe's evidence was inadmissible notwithstanding the error in admitting the State's evidence. *See* Minn. R. Evid. 403 (providing that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice").

I depart from the court's conclusion that the trial court's error does not merit a remedy. We have held that the rape-shield law must give way when "admission is constitutionally required by the defendant's right . . . to offer evidence in his own defense." *State v. Benedict*, 397 N.W.2d 337, 341 (Minn. 1986); *see also State v. Valtierra*, 718 N.W.2d 425, 436 (Minn. 2006) (allowing a party to introduce inadmissible evidence when an opposing party "opens the door" to the evidence). We have recognized that "the right to present a defense encompasses the right to offer the testimony of witnesses so that the defense can present its version of the facts to the jury as well as the state so that the jury can decide where the truth lies." *State v. Quick*, 659 N.W.2d 701, 713 (Minn. 2003) (citing *Washington v. Texas*, 388 U.S. 14, 19 (1967)). Because Wenthe was significantly older than A.F. and served as her priest, the State's sexual-history evidence fed into an already-existing bias against Wenthe that he enjoyed greater authority over A.F. than may have actually existed. The evidence also served to buttress A.F.'s credibility on the critical question of whether the meeting included a spiritual counseling component. This was certainly the State's intention, whether it intended to violate the rape-shield law or not. Thus, once the State opened the door to evidence of

D-12

A.F.'s sexual history, Wenthe should have been afforded the right to present evidence rebutting this perception by demonstrating that A.F. was more experienced sexually than the State's evidence suggested.

I also disagree that the trial court's error was harmless beyond a reasonable doubt. The sole disputed issue in this case was whether Wenthe and A.F. met for a spiritual or religious purpose. Wenthe's defense was that his association with A.F. began as a priest-parishioner relationship, but that it had evolved before the first instance of sexual penetration. Given the evidence of A.F.'s sexual history presented by the State, Wenthe's rebuttal evidence is highly probative of whether the meeting at which the two had sexual contact included a spiritual counseling component.

The brief reference to past sexual partners in A.F.'s testimony does not diminish the relevance of Wenthe's rebuttal evidence, as the court suggests. The numerous references to A.F.'s sexual inexperience outweigh the single sentence that alluded to other sexual partners. Inexplicably, the court views A.F.'s offhand reference to previous sexual partners as equally probative to Wenthe's opportunity to call attention to A.F.'s sexual history and draw reasonable conclusions from that history. I would conclude that this brief reference was insufficient to undo the prejudice caused by the State's introduction of inadmissible evidence.

The trial court afforded the State an unfair advantage by admitting misleading evidence of A.F.'s sexual inexperience, and the proper remedy was to allow Wenthe to admit rebuttal evidence. The trial court's failure to do so denied Wenthe's right to a fair trial.

D-13

For the above reasons, I respectfully dissent.